**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| DEBORAH PETTRY and GAIL FRIEDT, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | C.A. No. 2020-0132-KSJM |
| GILEAD SCIENCES, INC., | ) ) ) | |
| Defendant. | ) ) | |
| RICHARD C. COLLINS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | C.A. No. 2020-0138-KSJM |
| GILEAD SCIENCES, INC., | ) ) ) | |
| Defendant. | ) ) | |
| HOLLYWOOD POLICE OFFICERS' RETIREMENT SYSTEM, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | C.A. No. 2020-0155-KSJM |
| GILEAD SCIENCES, INC., | ) ) ) | |
| Defendant. | ) ) | |

|  |  |
|---|---|
| ANTHONY RAMIREZ,<br><br>Plaintiff,<br><br>v.<br><br>GILEAD SCIENCES, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  C.A. No. 2020-0173-KSJM<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION

Date Submitted: August 26, 2020
Date Decided: November 24, 2020

Blake A. Bennett, COOCH AND TAYLOR, P.A., Wilmington, Delaware; Brian J. Robbins, Stephen J. Oddo, Eric M. Carrino, ROBBINS LLP, San Diego, California; *Counsel for Plaintiffs Deborah Pettry and Gail Friedt.*

Kurt M. Heyman, Gillian L. Andrews, HEYMAN, ENERIO, GATTUSO & HIRZEL LLP, Wilmington, Delaware; Gustavo F. Bruckner, Daryoush Behbood, POMERANTZ LLP, New York, New York; *Counsel for Plaintiff Richard C. Collins.*

Gregory V. Varallo, BERNSTEIN, LITOWITZ, BERGER & GROSSMANN LLP, Wilmington, Delaware; David Wales, Alla Zayenchik, BERNSTEIN, LITOWITZ, BERGER & GROSSMANN LLP, New York, New York; Robert D. Klausner, KLAUSNER, KAUFMAN, JENSEN, & LEVINSON; *Counsel for Plaintiff Hollywood Police Officers' Retirement System.*

Gregory V. Varallo, BERNSTEIN, LITOWITZ, BERGER & GROSSMANN LLP, Wilmington, Delaware; Francis A. Bottini, Jr., Anne B. Beste, BOTTINI & BOTTINI, INC., La Jolla, California; Mark C. Molumphy, Tyson C. Redenbarger, Noorjahan Rahman, COTCHETT, PITRE & MCCARTHY, LLP; *Counsel for Plaintiff Anthony Ramirez.*

Brian C. Ralston, Aaron R. Sims, David M. Hahn, POTTER, ANDERSON & CORROON LLP, Wilmington, Delaware; John C. Dwyer, Shannon M. Eagan, Tijana Brien, Christopher Vail, COOLEY LLP, Palo Alto, California; *Counsel for Defendant Gilead Sciences, Inc.*

**McCORMICK, V.C.**

Each of the five stockholder plaintiffs seeks to inspect books and records of Gilead Sciences, Inc. ("Gilead" or the "Company"). The stated purpose of their respective inspections is to investigate possible wrongdoing in connection with the Company's development, marketing, and sale of HIV drugs.[1] When a stockholder seeks inspection for the purpose of investigating wrongdoing, the stockholder must demonstrate a credible basis to suspect possible wrongdoing.

To demonstrate a credible basis, the complaint tells a story as replete with inequity as the biblical verse that the Company's namesake brings to mind.[2] In 2001, Gilead received FDA approval for tenofovir disoproxil fumarate ("TDF"), a life-saving medication for persons living with HIV. TDF has generated billions in revenue for Gilead year after year. These revenues incentivized Gilead to protect the market for TDF by forestalling the market entry of generic TDF and delaying the development of Gilead's safer TDF-substitute drug called tenofovir alafenamide ("TAF"). The plaintiffs say that there is a credible basis to suspect that Gilead violated antitrust laws, committed mass torts, infringed on government patents, and defrauded government programs in its efforts to protect the TDF market.

In stating their credible basis, the plaintiffs join in chorus with a host of other accusers. Gilead's activities have drawn lawsuits and investigations from persons living

---

[1] There are two forms of HIV, HIV-1 and HIV-2, and both can develop into the most severe phase of HIV infection, AIDS. While acknowledging that these are extremely important distinctions, this decision describes Gilead's products as "HIV" drugs or treatments to avoid overcomplicating an already complex set of facts.

[2] *See, e.g.*, *Hosea* 6:8.

with HIV, activists, regulatory agencies, the Department of Justice, and Congress. As just one example, in 2019, activists and union benefit funds filed a class action complaint in federal court alleging that Gilead and its competitors violated federal and state antitrust laws by engaging in anticompetitive conduct to prevent competition in the market for TDF-based drugs. The plaintiffs in that case seek billions of dollars in damages. In March 2020, the federal court partially denied a motion to dismiss, allowing portions of the case to move forward.

The credible basis standard is widely described as the "lowest possible burden of proof" under Delaware law,[3] and Gilead does not meaningfully attack the plaintiffs' credible basis. Gilead half-heartedly argues that the plaintiffs' credible basis is merely an echo of unsubstantiated allegations made in other lawsuits and should be given no credence. But Gilead does not explain why a credible basis analysis should ignore allegations forming the basis of other lawsuits, and there is no principled ground for categorically disregarding such information.

Gilead's main strategy is to launch a number of peripheral attacks designed to chip away at the plaintiffs' proper purposes. Gilead asserts a defense based on *Wilkinson v. A. Schuman, Inc.*, in which this court denied inspection where the defendant proved that the plaintiff was a passive conduit in a purely lawyer-driven inspection effort.[4] As multiple subsequent decisions of this court have made clear, *Wilkinson* involved extreme facts, and

---

[3] *See, e.g.*, *Seinfeld v. Verizon Comm'ns, Inc.*, 909 A.2d 117, 123 (Del. 2006).

[4] *See* 2017 WL 5289553, at *3–4 (Del. Ch. Nov. 13, 2017).

Gilead's argument that five separate plaintiffs represented by four separate sets of counsel committed the same blunders found in *Wilkinson* borders on absurd. A corporation is entitled to assert defenses in a Section 220 action and probe the bona fides of a plaintiff's stated purpose. In this case, however, Gilead's pursuit of the *Wilkinson* defense raises more questions about Gilead's purposes than the plaintiffs'.

Gilead asserts myriad other defenses, arguing that the plaintiffs should be denied inspection because any follow-on derivative claims they might pursue would not pass the pleading stage. Gilead peddles these points as "standing" arguments, presumably because this court recently rejected a series of nearly identical points when framed as "proper purpose" deficiencies.[5] This semantic sleight of hand is unsuccessful, and Gilead's so-called "standing" arguments fare no better.

As a fallback, Gilead makes a series of arguments concerning the scope of inspection, contending that inspection should be limited to formal board materials. This decision rejects those arguments because multiple other categories of documents are necessary and essential to the plaintiffs' stated purposes.

Regrettably, Gilead's overly aggressive defense strategy epitomizes a trend. As described recently by a group of scholars, defendants are increasingly treating Section 220 actions as "surrogate proceeding[s] to litigate the possible merits of the suit" and "place obstacles in the plaintiffs' way to obstruct them from employing it as a quick and easy pre-

---

[5] *See Lebanon Cnty. Emps. Ret. Fund v. AmerisourceBergen Corp.*, 2020 WL 132752, at *6–24 (Del. Ch. Jan. 13, 2020).

filing discovery tool."[6] Defendants like Gilead adopt this strategy with the apparent belief that there is no real downside to doing so, ignoring that this court has the power to shift fees as a tool to deter abusive litigation tactics. Gilead's approach might call for fee shifting in this case, and the plaintiffs are granted leave to move for their expenses, including attorneys' fees, incurred in connection with their efforts to obtain books and records.

## I.     FACTUAL BACKGROUND

The facts are drawn from the factual stipulations in the parties' pre-trial order, the testimony of each plaintiff (all by deposition and one also at trial), and the 262 joint trial exhibits submitted by the parties.[7]

### A.     Gilead's HIV Treatments

For more than a decade, Gilead has been a leader in the discovery, development, and commercialization of antiretroviral therapy for HIV.[8]  Some estimate that Gilead controls approximately 75% of the HIV drug market.[9]  Millions of people depend on Gilead's HIV treatments for their survival.[10]  The corollary is that Gilead depends on the

---

[6] James D. Cox et al., *The Paradox of Delaware's "Tools at Hand" Doctrine: An Empirical Investigation*, 75 Bus. Law. 2123, 2150 (2020).

[7] Unless otherwise noted, pleadings are cited by reference to items docketed in C.A. No. 2020-0173-KSJM ("Dkt."). Factual citations are to: the Amended Pre-Trial Stipulation and Order, Dkt. 101 ("PTO"); Transcripts of Depositions of Richard C. Collins, Gail Friedt, Deborah Pettry, Anthony E. Ramirez, and Hollywood's Rule 30(b)(6) Representative, David M. Williams, Dkt. 82 (cited using the deponent's last name and "Dep. Tr."); the Trial Transcript, Dkt. 97 ("Trial Tr."); and Joint Trial Exhibits (cited by "JX" number).

[8] JX-213.

[9] *See, e.g.*, JX-250 at 2.

[10] *See* JX-213.

4

sale of HIV treatments for much of its financial survival. In 2019, for example, the sale of HIV treatments produced more than $16.4 billion in revenue or 73% of its top-line.[11]

A brief history of the development and commercialization of Gilead's HIV treatments lays the backdrop for this lawsuit. Gilead received Food and Drug Administration ("FDA") approval for its ground-breaking HIV treatment—TDF—in 2001.[12] Initially sold commercially as Viread, TDF was a significant improvement over other drugs.[13] After TDF was approved, Gilead shifted its efforts toward reducing the number of pills a persons infected with HIV would take daily. Gilead developed a combined formulation of TDF and a drug called emtricitabine that could be administered as a fixed-dose, once-daily tablet.[14] The result, Truvada, was approved as an HIV treatment in 2004.[15] Truvada was later approved for use by high-risk, uninfected adults as part of an HIV-preventative strategy called pre-exposure prophylaxis ("PrEP").[16] In addition to Viread and Truvada, the FDA approved three of Gilead's other TDF-based HIV treatments: Atripla in 2006, Complera in 2011, and Stribild in 2012.[17]

---

[11] *See* JX-135 at 34.

[12] JX-77 at 3.

[13] *See id.*

[14] *Id.* at 4.

[15] JX-3 at 1.

[16] JX-26 at 1.

[17] JX-27 at 1.

TDF poses safety risks for the patients' kidneys and bones.[18] In 2007, Gilead scientists published an article discussing TDF safety issues, which identified the most common adverse events as including renal failure, Fanconi syndrome, and serum creatinine increase.[19] In 2007, Gilead updated its labeling to recognize that TDF-associated renal damage also causes bone softening in patients.[20] A high dose of TDF is typically required to achieve the desired therapeutic effect.[21] The higher the dose of TDF, the greater are its toxic effects.[22]

Before the FDA approved Gilead's first TDF-based drug in 2001, Gilead had discovered another way of administering tenofovir—TAF.[23] TDF and TAF both deliver tenofovir to the target blood cells, but TAF delivers tenofovir more efficiently, which allows for a dose of less than one-tenth that of TDF.[24] The lower dosage in turn reduces toxicity levels and makes TAF safer than TDF.[25] Gilead highlighted the benefits of TAF-

---

[18] JX-244 ¶ 215.

[19] JX-68 ¶ 221.

[20] *Id.* ¶ 224.

[21] *Id.* ¶ 212.

[22] *Id.*

[23] *Id.* ¶ 194.

[24] JX-68 ¶ 195; JX-41 at 1–2.

[25] *See id.*

based drugs over its TDF-based drugs in a 2001 10-K,[26] and Gilead continued testing TAF through 2004, frequently touting positive results from clinical studies on the market.[27]

Despite its safety benefits, Gilead shelved the development of TAF-based drugs in October 2004, attributing the decision to patients' increasing use of TDF-based Viread and the FDA approval of TDF-based Truvada, among other things.[28]

Gilead did not renew development of TAF-based drugs until 2010, six years after it shelved the project.[29] Gilead did not submit a new drug application for a TAF-based drug until November 2014.[30] When rolling out its TAF products, Gilead repeatedly marketed TAF as a safer replacement for TDF.[31]

---

[26] JX-68 ¶ 243 (citing Gilead Sciences, Inc., Form 10-K 13, https://www.sec.gov/Archives/edgar/data/882095/000091205702011690/a2073842z10-k.htm).

[27] *Id.* ¶¶ 244–48.

[28] *Id.* ¶ 249 (quoting Press Release, Gilead, Gilead Discontinues Development of GS 9005 and GS 7340; Company Continues Commitment to Research Efforts in HIV (Oct. 21, 2004), https://www.gilead.com/news/press-releases/2004/10/gilead-discontinues-development-of-gs-9005-and-gs-7340-company-continues-commitment-to-research-efforts-in-hiv).

[29] *Id.* ¶ 255.

[30] JX-35 at 1.

[31] *See, e.g.*, JX-40 (describing TAF as a product for patients who wanted to "replace their current antiretroviral treatment regimen" and touting the "safety and efficacy" of TAF, despite acknowledging that "TAF-based regimens are investigational products and have not been determined to be safe or efficacious"); JX-42 at 2 (Gilead's then-EVP of Commercial Operations, Paul Carter, stating that "[Genvoya] has been launched in the context of HIV patient around the world who are getting older and older. And the average age in the US now is actually over 50 years, for an HIV patient. And HIV in itself causes renal issues and can have impact on bone density. And so, I think everyone is very happy to see that we now have a new generation of HIV single-tablet regimens which have a much better safety profile and tolerability and can be used for many, many years."); *id.* (stating that Genvoya would replace Truvada as the "backbone" component of the

Gilead expanded its TAF franchise through 2015, submitting new drug applications for a fixed-dose combination of emtricitabine and TAF and a single-tablet TAF regimen in April and July 2015, respectively.[32] The FDA approved Gilead's TAF-based treatment, Genvoya, in November 2015.[33] Within two weeks of Genvoya's approval, TAF became listed as a preferred treatment option under the U.S. Department of Health and Human Services guidelines.[34] Gilead later received approval for the TAF-based drugs Odefsey, Descovy, and Biktarvy.[35]

**B.      Criticisms of Gilead's Development and Commercialization of HIV Treatments**

Gilead's development and commercialization of its HIV treatments has drawn extensive criticism from persons living with HIV, regulatory agencies, HIV activists, the Department of Justice (the "DOJ"), and Congress. Gilead has faced antitrust lawsuits, mass tort claims, patent infringement litigation, and False Claims Act investigations.

---

combination therapies); JX-58 at 2 (Gilead's President and CEO, John Milligan, stating that he hopes TAF will be the "safest gentlest, yet most powerful option" available to HIV patients).

[32] *See* JX-39 (fixed-dose combination TAF); JX-40 (single-tablet TAF regimen).

[33] JX-41 at 1.

[34] *See* JX-42 at 2 (noting that becoming listed that quickly as a preferred treatment option was "unprecedented").

[35] *See* JX-47 at 1 (Odefsey); JX-49 at 1 (Descovy); JX-64 at 1 (Biktarvy); *see also* JX-90 at 1 (press release announcing approval of Descovy for PrEP use). Gilead also received approval for certain TAF-based drugs used to treat Hepatitis B. In January 2016, Gilead submitted an application for TAF to treat chronic Hepatitis B. JX-45 at 1. In November 2016, the FDA approved Vemlidy, a TAF-based regimen, for the treatment of chronic Hepatitis B. JX-55 at 1.

### 1. Anticompetitive Activities

Gilead is accused of delaying the launch of generic versions of its TDF-based HIV treatments by entering into anticompetitive licensing agreements with several branded drug manufacturers and collusive settlement agreements with generic drug manufacturers.[36]

Gilead is regulated by multiple agencies, including the FDA.[37] After a new drug is approved, federal law provides certain exclusivity benefits to pharmaceutical companies, such as a five-year new chemical exclusivity.[38] After four years of exclusivity, a generic manufacturer can file an Abbreviated New Drug Application ("ANDA") showing, among other things, that the generic drug contains the same active ingredients as the branded drug and does not infringe on the branded drug's patent.[39] If the branded drug manufacturer brings a claim against the generic drug manufacturer for patent infringement within the first 45 days after the filing of the ANDA, then the FDA stays the ANDA until the earlier of (a) the passage of 30 months running from date that exclusivity ends, or (b) the issuance of a decision holding that the patent is invalid or there was no infringement.[40] Thus, seven and a half years is usually the longest that a new chemical exclusivity period will run.

---

[36] *See* JX-244.

[37] JX-135 at 20 ("Our operations depend on compliance with complex FDA and comparable international regulations. Failure to obtain broad approvals on a timely basis or to maintain compliance could delay or halt commercialization of our products.").

[38] JX-244 at ¶¶ 88–91 (citing 21 U.S.C. §§ 355(j)(5)(F)(ii), 355(c)(3)(E)(ii); 21 C.F.R. § 314.108(b)(2)). During this period, no other drug using that chemical as an active ingredient can obtain FDA approval.

[39] *Id.* ¶¶ 73–76 (citing 21 U.S.C. § 355(j)(8)(B)).

[40] *See id.* ¶¶ 78, 88–91, 280 (citing 21 U.S.C. § 355; 21 C.F.R. § 314.108(b)(2)).

Generally, the introduction of a generic drug on the market causes price declines and sales erosion of branded drugs.[41] Branded drug manufacturers therefore have incentives to restrict and impede generics from entering the market.

Between 2004 and 2011, Gilead entered into a number of agreements with branded drug manufacturers, including Bristol-Myers Squibb Company ("Bristol-Myers"), Japan Tobacco, Inc. ("Japan Tobacco"), and Janssen R&D Ireland ("Janssen"), to create combination therapies that have multiple active ingredients or to license certain compounds for exclusive commercialization.[42] The agreements allegedly included "No-Generics

---

[41] A Federal Trade Commission study found that, on average, within one year of generic entry into the market, generics capture 90% of sales and prices decrease 85%. *Id.* ¶ 93 (citing FTC, Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions at 8 (January 2010), https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf). Gilead has recognized the potential for sales erosion in its public filings. *See, e.g.*, JX-135 at 12 ("[A]s new branded or generic products are introduced into major markets, our ability to maintain pricing and market share may be affected.").

[42] In December 2004, Gilead and Bristol-Myers formed a joint venture to develop and commercialize a once-daily, fixed-dose combination HIV treatment regimen later named Atripla. *See* JX-6 at 1; JX-74 ¶¶ 114–18. In March 2005, Gilead and Japan Tobacco entered into a licensing agreement that gave Gilead the exclusive right to develop and commercialize a novel HIV integrase inhibitor in all countries except Japan. JX-7 at 1. In July 2009 and June 2011, Gilead entered into licensing agreements with Janssen to develop and commercialize once-daily fixed-dose combination antiretroviral products. *See* JX-12 at 1 (press release announcing 2009 licensing agreement); JX-21 at 1 (press release announcing 2011 licensing agreement). (Janssen was formerly known as "Tibotec Pharmaceuticals." *See, e.g.*, JX-12; JX-21.) In December 2014, Gilead expanded its agreements with Janssen to allow for the development and commercialization of a new once-daily, single tablet regiment containing Gilead's TAF and emtricitabine, and Janssen's rilpivirine. JX-36 at 1. The agreement provided that the new product would be distributed by Janssen in "approximately 17 markets" and by Gilead in all other markets. *Id.* In October 2011, Gilead entered into a licensing agreement with BMS to develop and commercialize a fixed-dose combination of BMS's REYATAZ and Gilead's cobicistat—

10

Restraints" barring the creation of competing versions of the combination therapies that use generic TDF.[43]

In 2013, Gilead entered into a settlement agreement with the largest generic manufacturer in the world, Teva Pharmaceutical Industries Ltd. ("Teva").[44] Under the terms of the settlement, Teva would be prevented from launching a generic version of Truvada until December 2017.[45] The settlement also reduced the incentives for ANDA second-filers to enter the market before December 2017 because the settlement allowed Teva to enter the market should a second-filer gain market entry.[46]

In 2017, a group of prominent HIV activists, including Peter Staley, implored the New York attorney general to investigate the Teva settlement and other agreements with

---

later named Evotaz. *See* JX-24 at 1; JX-242 at 23.

[43] JX-74 ¶¶ 89–112.

[44] *See* JX-29. In 2008, Teva submitted an ANDA requesting permission to manufacture and commercialize a generic version of Truvada. JX-10. Teva alleged that two of the patents associated with Truvada were invalid, unenforceable, or would not be infringed by Teva's manufacture of the product described in its ANDA. *Id.* If Gilead agreed, then Teva could begin producing its generic product immediately. If Gilead sued for patent infringement within 45 days, however, Teva would be unable to produce its generic product until the earlier of 30 months or a district court decision that is adverse to Gilead. *Id.* Gilead sued Teva for patent infringement less than 45 days after Teva submitted its ANDA. *See* JX-11. In 2012, Lupin Limited ("Lupin") and Cipla Ltd. ("Cipla") both submitted an ANDA to manufacture and commercialize generic versions of Truvada and Viread, respectively. JX-32 at 23. Gilead filed patent infringement lawsuits in response to those ANDA submissions as well. *Id.*

[45] *See* JX-29.

[46] *See* JX-74 ¶¶ 321–55.

11

generic drug manufacturers concerning the generic production of Truvada.[47] The activists

accused Gilead of paying generic drug manufacturers to delay launching generics.[48]

In May 2019, Staley and others filed a thirteen count class action complaint against

Gilead and other companies in the United States District Court for the Northern District of

California (the "*Staley* Action").[49] The complaint alleges that Gilead and other branded

drug manufacturers violated federal and state antitrust laws by engaging in anticompetitive

conduct in the market for Gilead's TDF-based drugs.[50] Several additional class action

lawsuits followed, and they were subsequently consolidated into the *Staley* Action.[51]

The plaintiffs in the *Staley* Action seek billions of dollars in damages on behalf of a

class of persons who purchased or reimbursed purchasers of HIV treatments sold by Gilead

---

[47] JX-59; JX-60.

[48] JX-59; JX-60.

[49] JX-74. On the same day that the *Staley* Action was filed, the House Committee on Oversight and Reform announced that it would hold a hearing to examine Gilead's pricing of Truvada. *See* JX-75. Gilead Chairman and CEO Daniel O'Day testified at the hearing on May 16, 2019. *See* JX-77. After discussing Gilead's contribution to the development of Truvada and related patents for PrEP, O'Day testified: "We priced Truvada, when it was originally approved, based on the price of its two component drugs, without adding a premium. We have increased its list price over the years at a rate consistent with average price increases in the industry." JX-77, at 2, 7–8. An expert later testified that "Gilead insisted on valuing drug shipments based on the commercial price in the United States, rather than the cost of manufacturing, which was at least 300 times less. . . . PrEP [treatments] can be manufactured and distributed, including a profit, for about $6 per person per month. Gilead charges more than $2100 per person per month, a 35000% markup." JX-76 at 3, 2–5. On June 26, 2019, the committee sent Gilead requests for documents and information regarding its pricing of Truvada. JX-81.

[50] JX-74.

[51] *See* JX-255.

and the other defendants.[52] On March 3, 2020, the United States District Court (the "District Court") in the *Staley* Action granted in part and denied in part Gilead's motion to dismiss, and granted leave to amend certain of the claims that were dismissed.[53]

In relevant part, the District Court dismissed with leave to amend the claims that there was an overarching conspiracy among Gilead, Bristol-Myers, Japan Tobacco, and Janssen.[54] The court dismissed with prejudice the claims based on the Gilead/Japan Tobacco licensing agreement because the plaintiffs did not plead any specific allegations that "the exclusive license would be used in an anticompetitive way."[55]

The District Court denied the motion to dismiss as to claims based on: the No-Generics Restraints in the Gilead/Bristol-Myers and Gilead/Janssen agreements; the Teva settlement agreement; and Gilead's commercialization of TAF.[56] As to the Gilead/Bristol-Myers and Gilead/Janssen agreements, the court found that a question of fact existed as to whether the No-Generics Restraints had sufficient anticompetitive effect to constitute an antitrust violation.[57] As to the Teva settlement agreement, the court cited several "yellow

---

[52] *See* JX-74 ¶ 429; *see also* PTO ¶ 4 ("If plaintiffs are successful in their claims, [Gilead] could be required to pay significant monetary damages or could be subject to permanent injunctive relief.").

[53] JX-242 at 85–87.

[54] *Id.* at 15–16.

[55] *Id.* at 32, 31–33.

[56] *Id.* at 85–86.

[57] *Id.* at 26.

flag[s]" that could give rise to a finding of anticompetitive conduct.[58] As to Gilead's delayed commercialization of TAF, the District Court found that the plaintiffs have "a plausible argument that there is no procompetitive justification for" it.[59]

In January 2020, a group of healthcare insurers filed a class action against Gilead and other companies in a Florida federal court, asserting claims substantially similar to those in the *Staley* Action.[60]

### 2. Mass Torts

Gilead is accused of intentionally withholding from the market its safer and potentially more effective TAF-based HIV treatments in order to extend the sales window for its more dangerous and less effective TDF-based treatments.[61]

As discussed above, multiple parties have alleged that Gilead shelved the development of TAF after receiving approval for Truvada, even though Gilead knew that TAF was a safer product.[62] Gilead then allegedly waited to resume development and

---

[58] *Id.* at 41, 38–42.

[59] *Id.* at 46. On April 21, 2020, the plaintiffs in the *Staley* Action filed an amended complaint, and on May 4, Gilead filed a motion to dismiss the amended complaint. *See* JX-175 (motion to dismiss amended complaint); JX-244 (amended complaint).

[60] *See* JX-117; *see also* JX-118 at 3 ("The allegations are similar to those made in four consolidated class actions against Gilead pending in the Northern District of California.").

[61] *See* JX-252; *see also* PTO ¶ 4 (noting that "Gilead has been named as a defendant in product liability lawsuits related to Gilead's HIV medications").

[62] *See, e.g.*, JX-244 ¶¶ 236–98; JX-252.

commercialization of TAF-based products until the introduction of generic TDF-based treatments was imminent.[63]

Gilead is the subject of at least 250 tort actions pending in state and federal courts in California, Delaware, and Florida. The actions involve more than 15,000 plaintiffs claiming that Gilead's TDF-based HIV medications caused them to suffer personal injury and economic loss.[64] If those claims are successful, Gilead "could be required to pay significant monetary damages."[65]

### 3. Patent Infringement

Gilead is accused of infringing on government patents in the sales of its HIV PrEP treatments.

The U.S. government claims that when administered as a PrEP treatment, Truvada and Descovy rely on patents developed by the Centers for Disease Control and Prevention (the "CDC") and owned by the U.S. government.[66]

During a May 2019 hearing before the U.S. House Committee on Oversight and Reform, an expert in HIV research and clinical care testified:

> The US Government is by far the majority funder of PrEP research. PrEP regimen selection was guided by research conducted by scientists at the CDC who demonstrated that adding emtricitabine to a tenofovir regimen increased protection. . . . The critically important research done by scientists at the CDC led to a US Government patent on the

---

[63] *See* JX-244 ¶¶ 236–98; JX-252.

[64] *See* JX-134 at 80; JX-255 at 2.

[65] PTO ¶ 4; JX-134 at 80.

[66] JX-73 at 1.

combined use of emtricitabine and tenofovir esters for PrEP. . . . Gilead Sciences did not provide leadership, innovation, or funding for these projects; Gilead's role was limited to donating study medication and placebos. Our protocols were shared with Gilead, in accordance with an agreement between the [National Institutes of Health] and Gilead; I do not recall receiving any comments.[67]

On November 6, 2019, the U.S. government filed suit against Gilead.[68] The complaint alleges that Gilead has wrongfully denied the validity of the CDC's patents and refused to obtain a license from the CDC to use the patented regimens.[69]

In February 2020, the Patent Trial and Appeals Board declined to institute Gilead's petitions for *inter partes* review of the four U.S. government-held patents, finding that Gilead "has not demonstrated a reasonable likelihood of prevailing."[70]

In April 2020, Gilead filed a lawsuit against the U.S. government related to the use of the same anti-HIV regimens.[71] Gilead's complaint alleges that the CDC breached the agreements between the parties and the government's patents are therefore invalid and unenforceable.[72]

---

[67] JX-76 at 2. The expert, Professor Robert M. Grant, is a credible source. As he explained to the committee, he had decades of experience "with research and clinical care related to HIV," "pioneered research on PrEP that led to FDA approval in 2012 [and] recommendations from the CDC in 2014," and "devoted . . . 20 years of [his] career to the development of PrEP." *Id.*

[68] JX-98; *see also* JX-99 (11/8/19 New York Times article discussing the lawsuit); JX-102 (11/8/19 Science Magazine article discussing the lawsuit).

[69] *Id.* ¶¶ 8–9.

[70] JX-246 at 21; JX-247 at 12.

[71] JX-170, *Gilead Scis., Inc. v. United States*, 1:20-cv-00499-CFL (Fed. Cl. Apr. 24, 2020).

[72] *Id.* ¶¶ 1–21.

### 4. False Claims Act Violations

Gilead is currently facing a federal investigation and civil litigation related to alleged violations of the False Claims Act.[73]

Under federal law, drug companies cannot provide direct copayment assistance to patients covered by Medicare.[74] Drug companies are permitted to donate to charities that help Medicare patients, so long as the companies' donations do not exert sway over the nonprofit's operations.[75] If a drug company uses donations to encourage a nonprofit to promote the company's products, however, that conduct may violate anti-kickback laws.[76]

On May 27, 2016, Gilead received a subpoena from the U.S. Attorney for the District of Massachusetts seeking documents related to the Company's relationship with nonprofits that provide financial assistance to patients.[77] Corporate disclosures "describe an expanding investigation by the U.S. Attorney's Office" into Gilead and other pharmaceutical companies' potential kickback violations.[78] In December 2017, one of the companies agreed to pay $210 million to resolve the Justice Department's claims.[79]

---

[73] *See* JX-50; JX-88.

[74] JX-51 at 1.

[75] *Id.*

[76] *Id.*

[77] JX-50.

[78] JX-51.

[79] JX-61. Gilead is also facing a *qui tam* action alleging False Claims Act violations related to the Company's TDF- and TAF-based Hepatitis-B treatments. JX-88. On September 19, 2019, a group of plaintiffs filed a second amended *qui tam* complaint against Gilead in Pennsylvania federal court, alleging multiple violations of the anti-kickback provisions of the False Claims Act. *See id.* ¶¶ 1, 12–13. The complaint alleges that Gilead used its

17

## C.    The Inspection Demands

The plaintiffs are Deborah Pettry, Gail Friedt, Richard C. Collins, Hollywood Police Officers' Retirement System ("Hollywood"), and Anthony Ramirez (collectively, "Plaintiffs"). Each Plaintiff made a written demand on Gilead to inspect and copy certain books and records of the Company pursuant to Section 220 (collectively, the "Demands").[80] The Demands sought to investigate possible wrongdoing in connection with aspects of the development and commercialization of Gilead's HIV treatments.[81]

Gilead declined to provide even a single document in response to any of the Demands, taking the position that each Demand was unfounded and deficient.[82]

---

speaker program and other methods to encourage healthcare providers to write prescriptions for Gilead's name-brand drugs as opposed to generics. *Id.* ¶¶ 1–6. In particular, the complaint alleges that Gilead used illegal kickbacks to encourage healthcare providers to transition patients from Viread, a TDF-based drug that was about to face generic competition, to Vemlidy, its new TAF-based drug. *Id.* ¶¶ 30–35.

[80] *See* JX-103 (Collins's 12/2/19 inspection demand); JX-114 (Collins's 1/13/20 reply to Gilead's initial response); JX-128 (Collins's 2/18/20 supplemental demand); JX-108 (Pettry's 12/30/19 inspection demand); JX-113 (Friedt's 1/8/20 inspection demand); JX-120 (Pettry and Friedt's 1/29/20 consolidated reply to Gilead's initial response); JX-123 (Ramirez's 2/4/20 inspection demand); JX-136 (Ramirez's 2/27/20 reply to Gilead's initial response); JX-124 (Hollywood's 2/10/20 inspection demand).

[81] *See infra* note 95 and accompanying text.

[82] *See* JX-106 (Gilead's 12/10/19 response to Collins's initial demand); JX-130 (Gilead's 2/25/20 response to Collins's supplemental demand); JX-115 (Gilead's 1/15/20 response to Pettry's demand); JX-116 (Gilead's 1/15/20 response to Friedt's demand, containing multiple mistaken references to "Ms. Pettry" as opposed to "Ms. Friedt"); JX-126 (Gilead's 2/14/20 response to Pettry and Friedt's 1/29/20 communication); JX-125 (Gilead's 2/11/20 response to Ramirez's 2/4/20 demand); JX-139 (Gilead's 3/2/20 response to Ramirez's 2/27/20 communication); JX-127 (Gilead's 2/18/20 response to Hollywood's demand); JX-131 (Gilead's 2/25/20 rejection of Hollywood's invitation to meet and confer).

### D.    This Litigation

Each Plaintiff filed suit under Section 220 to enforce their inspection rights, with Pettry and Friedt filing a joint complaint.[83]  Gilead answered the complaints.[84]

Gilead requested that the court enter an order requiring Plaintiffs to coordinate their efforts,[85] and the parties stipulated to a coordinated schedule and approach to discovery.[86]

Gilead served interrogatories on, sought documents from, and moved to compel discovery from Plaintiffs.[87]  Gilead also deposed each Plaintiff.[88]

Gilead fought discovery directed to it and moved for a protective order, which the court denied.[89]

The court held trial on June 23, 2020, and the parties completing post-trial briefing on August 26, 2020.

---

[83] *See* JX-132; JX-137; JX-140; JX-141; *see also* JX-129.

[84] JX-142; JX-144; JX-261; JX-262.

[85] Dkt. 5, Def.'s Resp. to Pls.' Mots. for Expedited Proceedings at 5–6 ("Gilead respectfully submits that the Court should enter an order coordinating the actions.").

[86] Dkt. 8, Stipulation and Appointment of Counsel and Case Scheduling Order.

[87] *See* JX-147 (Def.'s First Set of Interrogs. Directed to Pls.); JX-148 (Def.'s First Set of Reqs. for Produc. of Docs. Directed to Pls.); Dkt. 38, Def.'s Mot. to Compel Disc. from Pls.  Plaintiffs provided Defendants with responses and supplemental responses to these requests.  *See* JX-155; JX-156; JX-157; JX-158; JX-159; JX-160; JX-161; JX-162; JX-163; JX-167; JX-169.

[88] *See* Dkt. 82.

[89] *See* Dkt. 17, Def.'s Mot. for Protective Order; Dkt. 65, May 8, 2020 Oral Arg. re Def.'s Mot. for Protective Order and the Ct.'s Ruling; *see also* JX-164 (Def's. Responses and Objs. to Pls.' Am. First Set of Interrogs. Directed to Def. Gilead Sciences, Inc.); JX-149 (Pls.' Am. Notice of Rule 30(b)(6) Dep. of Def. Gilead Sciences, Inc.).

## II.   LEGAL ANALYSIS

To inspect books and records under Section 220, a plaintiff must establish by a preponderance of the evidence that the plaintiff is a stockholder, has complied with the statutory form and manner requirements for making a demand, and has a proper purpose for conducting the inspection.[90] If a stockholder meets these requirements, the stockholder must then establish "that each category of the books and records requested is essential and sufficient to the stockholder's stated purpose."[91]

Gilead disputes two of these requirements, arguing that Plaintiffs lack proper purposes and have failed to justify the scope of their inspections. Gilead also raises what it refers to as "standing" issues, arguing that Plaintiffs must overcome defenses to anticipated derivative claims in order to have standing to enforce their rights in this Section 220 action. Gilead's so-called "standing" arguments in substance speak to Plaintiffs' proper purposes and this decision addresses the arguments in that context.

### A.   Each Plaintiff Has Demonstrated a Proper Purpose.

"The paramount factor in determining whether a stockholder is entitled to inspection of corporate books and records is the propriety of the stockholder's purpose in seeking such inspection."[92] A purpose is "proper" under Section 220 where it is

---

[90] *See* 8 *Del. C.* § 220(c); *Cent. Laborers Pension Fund v. News Corp.*, 45 A.3d 139, 144 (Del. 2012); *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 775 (Del. Ch. 2016), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019).

[91] *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996) (citing *Helmsman Mgmt. Servs., Inc. v. A & S Consultants, Inc.*, 525 A.2d 160, 167 (Del. Ch. 1987)).

[92] *CM & M Gp., Inc. v. Carroll*, 453 A.2d 788, 792 (Del. 1982) (citing 8 *Del. C.* § 220(b);

"reasonably related" to the stockholder's interest as a stockholder.[93] "In a section 220 action, a stockholder has the burden of proof to demonstrate a proper purpose by a preponderance of the evidence."[94]

The Demands state that they are for the purpose of investigating possible mismanagement, wrongdoing, or waste in connection with aspects of the development and commercialization of Gilead's HIV treatments, although each Demand uses slightly different verbiage to express this purpose.[95]

---

*Gen. Time Corp. v. Talley Indus.*, 240 A.2d 755 (Del. 1968); *Skoglund v. Ormand Indus.*, 372 A.2d 204, 207 (Del. Ch. 1976)).

[93] 8 *Del. C.* § 220(b).

[94] *Seinfeld*, 909 A.2d at 121.

[95] Collins seeks to "[i]nvestigat[e] whether any member of the Board or the Company's senior officers have mismanaged the Company and/or breached their fiduciary duties to the Company and its stockholders." JX-103 at 5; JX-128 at 15. Friedt and Petty seek to "investigate potential corporate mismanagement, wrongdoing, and waste by fiduciaries of the Company, including the [Board]." JX-108 at 1; JX-113 at 1. Hollywood seeks to investigate "possible breaches of fiduciary duty," "possible violations of positive law," "possible corporate misconduct by members of the [Board] and/or management in connection with . . . core HIV products," and "possible prolonged concealment of the misconduct described herein." JX-124 at 1. Ramirez seeks to "investigate whether the [Board] and certain senior Gilead executives may have breached their fiduciary duties to the Company by engaging in massive and long-standing wrongdoing in connection with the Company's development, patenting, marketing of, and restraints related to, its antiviral HIV/AIDS drugs." JX-89 at 4. Some of the demands also state that they are for the purpose of assessing the independence and disinterestedness of the members of the Board with respect to the possible wrongdoing at issue, *see* JX-124 at 1; JX-103 at 5; JX-128 at 15, but Plaintiffs did not treat this as an independent purpose in briefing. *See* Dkt. 100, Pls.' Corrected Combined Post-Trial Br. ("Pls.' Opening Br.") at 3–45, 56; Dkt. 104, Pls.' Combined Post-Tr. Reply Br. at 3–24, 32. This decision treats Plaintiffs' desire to investigate the independence and disinterestedness of Gilead's Board members as a component of its investigation into possible wrongdoing. *See infra* Section II.C.2.e.

21

Although a stockholder's desire to investigate wrongdoing is a proper purpose under Delaware law,[96] a mere statement of that purpose without more will not entitle a stockholder to inspection.[97] To inspect documents for the purpose of investigating mismanagement or wrongdoing, a stockholder "must present some evidence to suggest a credible basis from which a court can infer that mismanagement . . . or wrongdoing may have occurred."[98]

Gilead argues that no Plaintiff has demonstrated a credible basis to suspect possible wrongdoing.[99] Gilead further argues that each Plaintiff is acting as a Manchurian candidate for a law firm such that none of Plaintiffs' stated purposes are their own.[100] Gilead additionally argues that legal defenses to a follow-on lawsuit challenging the wrongdoing foreclose Plaintiffs' ability to investigate possible wrongdoing under Section 220.[101]

---

[96] *E.g.*, *KT4 P'rs v. Palantir Techs. Inc.*, 203 A.3d 738, 758 (Del. 2019) ("One of the most traditional proper purposes for a § 220 demand is the investigation of possible wrongdoing by management. When a stockholder has made a colorable showing of potential wrongdoing, inspecting the company's books and records can help the stockholder to ferret out whether that wrongdoing is real and then possibly file a lawsuit if appropriate." ); *City of Westland Police & Fire Ret. Sys. v. Axcelis Techs., Inc.*, 1 A.3d 281, 287 (Del. 2010) ("Our law recognizes investigating possible wrongdoing or mismanagement as a 'proper purpose.'"); *Seinfeld*, 909 A.2d at 121 ("It is well established that a stockholder's desire to investigate wrongdoing or mismanagement is a 'proper purpose.' Such investigations are proper, because where the allegations of mismanagement prove meritorious, investigation furthers the interests of all stockholders and should increase stockholder return.").

[97] *Seinfeld*, 909 A.2d at 122 (quoting *Helmsman*, 525 A.2d at 166).

[98] *Id.* at 118 (internal quotation marks omitted).

[99] Dkt. 102, Def. Gilead Sciences, Inc.'s Post-Trial Answering Br. ("Def.'s Answering Br.") at 5–15.

[100] *Id.* at 22–36.

[101] *See id.* at 36–44.

### 1. Plaintiffs Have Demonstrated a Credible Basis to Suspect Wrongdoing.

The credible basis standard imposes "the lowest possible burden of proof."[102] It does not require a stockholder to prove that the wrongdoing "actually occurred."[103] Nor does it require a stockholder "to show by a preponderance of the evidence that wrongdoing is probable."[104] Any such requirement "would completely undermine the purpose of Section 220 proceedings, which is to provide shareholders the access needed to make that determination in the first instance."[105] Rather, a stockholder need only establish by a preponderance of the evidence that there is a credible basis to suspect a *possibility* of wrongdoing.[106]

In determining whether a plaintiff has presented a credible basis for inspection, the court looks at the allegations collectively.[107] The "threshold may be satisfied by a credible

---

[102] *Seinfeld*, 909 A.2d at 123.

[103] *Marmon v. Arbinet-Thexchange, Inc.*, 2004 WL 936512, at *4 (Del. Ch. Apr. 28, 2004); *accord. Thomas & Betts*, 681 A.2d at 1031 ("While stockholders have the burden of coming forward with specific and credible allegations sufficient to warrant a suspicion of waste and mismanagement, they are not required to prove by a preponderance of the evidence that waste and mismanagement are actually occurring.").

[104] *AmerisourceBergen*, 2020 WL 132752, at *8.

[105] *La. Mun. Police Emps.' Ret. Sys. v. Countrywide Fin. Corp.* (*LAMPERS*), 2007 WL 2896540, at *12 (Del. Ch. Oct. 2, 2007), *order clarified*, 2007 WL 4373116 (Del. Ch. Dec. 6, 2007).

[106] *See AmerisourceBergen*, 2020 WL 132752, at *8–9; *see also Seinfeld*, 909 A.2d at 118 (holding that a Section 220 plaintiff need only allege a "'credible basis' from which a court can infer that mismanagement, waste or wrongdoing *may* have occurred" (emphasis added)).

[107] *See*, *e.g.*, *In re Lululemon Athletica Inc. 220 Litig.*, 2015 WL 1957196, at *11–14 (Del. Ch. Apr. 30, 2015) (collectively assessing founder's inside knowledge based on company

23

showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing."[108]   When evaluating whether a credible basis exists, the court may consider on-going lawsuits, investigations, circumstantial evidence, and even hearsay statements evincing possible wrongdoing.[109]

The Demands seek to investigate four categories of possible wrongdoing:

1.   Anticompetitive activity resulting in a multi-billion dollar lawsuit accusing Gilead of violating federal and state antitrust laws by colluding with its competitors to unlawfully extend patent protection and drive up the price of its HIV drugs;[110]

2.   Mass torts resulting in more than 15,000 claims by plaintiffs who allege that they were seriously harmed by Gilead's decision to intentionally delay the

---

emails, suspicious timing and magnitude of founder's trades, and the speed at which founder hit his monthly trading cap); *Paul v. China MediaExpress Hldgs., Inc.*, 2012 WL 28818, at *4 (Del. Ch. Jan. 5, 2012) (determining that plaintiff had identified a credible basis for Section 220 demand based on evidence which included "numerous third-party media reports," "the noisy resignations of three board members" and a publicly announced "internal investigation").

[108] *Seinfeld*, 909 A.2d at 123 (quoting *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 568 (Del. 1997)).

[109] *See*, *e.g.*, *AmerisourceBergen*, 2020 WL 132752, at *9 ("Ongoing investigations and lawsuits can provide the necessary evidentiary basis to suspect wrongdoing or mismanagement warranting further investigation.  This type of evidence is strong when governmental agencies or arms of law enforcement have conducted the investigations or pursued the lawsuits."); *LAMPERS*, 2007 WL 2896540, at *10–12 (finding a news article and independent statistical analysis of stock option grant dates sufficient to suspect options backdating); *Elow v. Express Scripts Hldgs. Co.*, 2017 WL 2352151, at *5, *5–6 (Del. Ch. May 31, 2017) (finding "pleadings in the Anthem Action, the Securities Action complaints, and public statements by Express Scripts" sufficient to establish a credible basis), *abrogated on other grounds by Tiger*, 214 A.3d 933; *Carapico v. Phila. Stock Exch., Inc.*, 791 A.2d 787, 792 (Del. Ch. 2000) (finding an "SEC inquiry" and "SEC Order" were "sufficiently concrete" to suspect mismanagement).

[110] *See* JX-113 at 1; JX-123 at 1–2; JX-124 at 4; JX-128 at 1.

24

introduction of safer and more effective HIV treatments in order to protect the profitability of existing branded medications;[111]

3.   Patent infringement resulting in a lawsuit by the DOJ against Gilead for its "deliberate" and "wanton" infringement of patents held by the federal government relating to PrEP treatment regimens;[112] and

4.   Kick-back schemes resulting in DOJ investigations into False Claims Act violations.[113]

At trial, Plaintiffs presented evidence to establish a credible basis to suspect possible wrongdoing in connection with each of these four categories.

To demonstrate a credible basis as to the anticompetitive activity, Plaintiffs rely primarily on the allegations and information contained in the *Staley* complaint as well as the federal court's decision on the motion to dismiss the *Staley* Action.[114]  The *Staley* complaint spans 134 pages and outlines a litany of allegedly anticompetitive conduct, reflecting significant research by the plaintiffs in that action.[115]  The parties to the *Staley* Action collectively filed thirty-eight exhibits during briefing on a motion to dismiss, including copies of the relevant agreements.[116]

---

[111] *See* JX-124 at 3–4; JX-128 at 1.

[112] *See* JX-103 at 1; JX-113 at 1; JX-124 at 5–6; JX-128 at 1.

[113] *See* JX-128 at 1.

[114] *See* Pls.' Opening Br. at 7–9.

[115] *See* JX-74.

[116] *See* Decl. of Jayne A. Goldstein in Supp. of Pls.' Omnibus Mem. in Opp'n to Defs.' Mot. to Dismiss, *Staley v. Gilead Scis., Inc.*, Case No. 3:19-cv-02573-EMC (N.D. Cal. 2019); Decl. of Heather M. Burke in Supp. Of Gilead's Mot. to Dismiss, *Staley*, Case No. 3:19-cv-02573-EMC.  The court can take judicial notice of these filings because they are "not subject to reasonable dispute."  *See, e.g.*, *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del. 2006) (citing D.R.E. 201(b)).

25

The *Staley* complaint discusses three broad categories of conduct that allegedly delayed the entry of generic competition: (i) No-Generics Restraints in agreements between Gilead and Japan Tobacco, Gilead and Bristol-Myers, and Gilead and Janssen; (ii) the Teva settlement; and (iii) the commercialization of TAF.[117] These categories of action are allegedly part of a broader scheme to restrain competition and increase the prices of HIV drugs.[118] The complaint contends that the No-Generics Restraints barred the creation of competing versions of combination therapies that use generic TDF.[119] The complaint further contends that the Teva settlement delayed Teva's entry into the TDF market and created disincentives for ANDA second-filers to launch their products. By thwarting the market entry of generic TDF, these agreements allowed Gilead to continue to charge high prices for TDF-based Stribild despite its toxicity and later helped Gilead shift prescriptions from Stribild to TAF-based Genvoya.[120] The agreements also allowed Gilead to avoid being pressured to release a standalone TAF product, because prescribers could not pair Gilead's standalone TAF with drugs offered by Gilead's competitors.[121] The plaintiffs allege that Gilead's actions, taken collectively, "unlawfully manipulated the regulatory framework in order to impair and delay . . . competition."[122]

---

[117] *See* JX-74 ¶¶ 88–355.

[118] *Id.* ¶¶ 1–15.

[119] *Id.* ¶ 4.

[120] *Id.* ¶¶ 237–44.

[121] *Id.* ¶ 245.

[122] *Id.* ¶ 285.

26

In response to Gilead's motion to dismiss, the District Court held that the plaintiffs' allegations regarding the Gilead/Bristol-Myers, Gilead/Janssen, and Gilead/Teva agreements and the commercialization of TAF stated a claim on which relief could be granted.[123] The federal motion-to-dismiss standard is higher than Section 220's credible basis standard.[124] It follows that allegations which survive a motion to dismiss under the federal standard are sufficient to meet the credible basis standard. Thus, the court finds that the allegations that survived the motion to dismiss in the *Staley* Action supply a credible basis to suspect possible wrongdoing as to the Gilead/Bristol-Myers, Gilead/Janssen, and Gilead/Teva agreements and the commercialization of TAF.

To demonstrate a credible basis as to the mass torts, Plaintiffs rely on the allegations and information in the pleadings in state and federal courts in California, Delaware, and Florida.[125] The mass tort class action in California, as of June 12, 2020, involved more than 15,000 plaintiffs.[126] The complaint in that action runs forty-four pages, alleges

---

[123] *See* JX-242 at 85–86. The court dismissed the overarching conspiracy claims and the claim related to the Gilead/Japan Tobacco agreement. JX-242 at 15, 33. Plaintiffs have since filed an amended complaint. *See* JX-244.

[124] *Compare Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (requiring a plaintiff to plead facts sufficient to "nudge[] their claims across the line from conceivable to plausible"), *and Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (requiring a Section 220 plaintiff seeking to investigate wrongdoing to holding that the *Twombly* plausibility standards applies to all civil cases in federal courts) *with Seinfeld*, 909 A.2d at 123 (describing the credible basis standard as "the lowest possible burden of proof" (internal quotation markets omitted)).

[125] Pls.' Opening Br. at 9–11.

[126] JX-255 at 2.

injuries stemming from Gilead's decision to intentionally delay its TAF-based HIV drugs, and asserts claims for negligence, strict product liability, breach of express warranty, breach of implied warranty, fraud, and concealment.[127] In particular, the complaint alleges that Gilead developed and marketed its toxic TDF-based medications and withheld the safer TAF-based medications from the market.[128] Rather than releasing the TAF-based medication, Gilead allegedly continued to add ingredients to its existing TDF-based medications "in order to extend its monopoly on tenofovir in the treatment of HIV-1."[129] The plaintiffs contend that Gilead did so knowing that reasonable alternatives were not available to patients.[130] The complaint references and quotes from papers that Gilead has published, submissions that Gilead made to U.S. and European patent offices, public announcements by Gilead representatives, statistics that have been corroborated by the CDC, studies conducted by third parties, and FDA findings.[131] The plaintiffs' complaint

---

[127] *See* JX-82. Further illustrating the scope of the litigation, Gilead produced nearly 2.6 million pages of documents in response to the plaintiffs' first and second requests for production—including FDA regulatory files, license agreements, a listing of clinical trials, and other documents—and trial is set for January 2022. *See id.*; JX-255 at 10–11.

[128] JX-82 ¶¶ 12–14, 33–48.

[129] *Id.* ¶¶ 76, 51–86.

[130] *Id.* ¶ 2.

[131] *See, e.g., id.* ¶ 40 (quoting Gilead paper comparing the relative effectiveness and safety of TAF as compared to TDF); *id.* ¶ 41 (citing Gilead patent submission showing that TAF was more effective than TDF); *id.* ¶ 60 (citing an October 2004 company announcement regarding the future of TAF development); *id.* ¶ 67 (citing HIV-treatment statistics that have been corroborated by the CDC); *id.* ¶ 78 (citing an April 2012 HIV study conducted by researchers at San Francisco's Veterans' Administration Medical Center and the University of California, San Francisco); *id.* ¶ 79 (quoting FDA characterization of TDF's safety profile); *id.* ¶ 91 (quoting Gilead's Chief Scientific Officer during an October 2010

is cohesive and coherent, and the information and allegations in the complaint as well as the myriad evidence supporting it, supply a credible basis to suspect possible wrongdoing in the form of mass torts.

To demonstrate a credible basis as to patent infringement, Plaintiffs rely on congressional testimony and subsequent litigation regarding Gilead's alleged infringement of U.S. government patents in the sales of Gilead's HIV PrEP treatments.[132]  After an expert provided the U.S. House Committee on Oversight with a detailed description of his work with the CDC and Gilead,[133] the U.S. government filed a patent infringement lawsuit against Gilead.[134]  The complaint totaled 1,739 pages including the ninety-two attached exhibits, and its filing was reported by multiple news outlets.[135]  The exhibits included the relevant patents, various news articles, and relevant scholarship from the scientific community.[136]  When Gilead sought review of the U.S. government's patents, the Patent Trial and Appeals Board held that Gilead "has not demonstrated a reasonable likelihood of prevailing."[137]  The thoroughness of the U.S. government's complaint and the Patent Trial

---

earnings call).

[132] Pls.' Opening Br. at 11–14.

[133] *See supra* note 67 and accompanying text.

[134] *See* JX-98.

[135] *See id.* (complaint); JX-99 (11/8/19 New York Times article covering the litigation); JX-102 (11/8/19 Science Magazine article covering the litigation).

[136] *See* JX-98 at 77–1739.

[137] JX-246 at 21; JX-247 at 12.

29

and Appeals Board's ruling easily clear the hurdle to establish a credible basis to suspect possible wrongdoing as to patent infringement.

To demonstrate a credible basis as to False Claims Act violations, Plaintiffs rely on the existence of four subpoenas issued by the DOJ.[138]  By 2016, Gilead was the subject of an "expanding investigation" by the U.S. Attorney for the District of Massachusetts related to possible violations of the False Claims Act.[139]  As disclosed in its public filings, Gilead received subpoenas in 2016 and 2017 requesting documents related to Gilead's relationship with certain charitable organizations, Gilead's copay coupon program, and Gilead's Medicaid price reporting methodology.[140]

Further, Gilead is facing a *qui tam* action in Pennsylvania federal court that alleges multiple violations of the anti-kickback provisions of the False Claims Act.[141]  Although that action focuses on Hepatitis B-providers, one of the drugs at issue (Viread) is also used to treat HIV.[142]  The complaint alleges that Gilead provided healthcare providers with illegal kickbacks in exchange for prescribing Gilead products.[143]  It contains public payment information from relevant healthcare providers to Gilead, detailed information regarding the composition of Gilead's advisory boards, public pricing information

---

[138] *See* Pls.' Opening Br. at 14–15.

[139] *See* JX-51 at 1.

[140] JX-134 at 79.

[141] *See* JX-88 at ¶¶ 1, 13.

[142] *See id.*; *see also* JX-55 (noting that Vemlidy is a TAF-based drug and an alternative to Viread).

[143] JX-88 ¶¶ 58–99.

regarding the drugs at issue, and quotes from internal emails referencing the speaker programs.[144] The combination of multiple government investigations relating to possible False Claims Act violations plus the ongoing *qui tam* litigation alleging the exact same conduct with respect to Gilead's Hepatitis B business, establishes a credible basis to suspect possible wrongdoing as to False Claims Act violations.

Gilead takes issue with Plaintiffs' reliance on the complaints in the other lawsuits, contending that unsubstantiated allegations cannot supply a credible basis to suspect possible wrongdoing.[145] As discussed above, however, the credible basis requirement does not require that allegations of wrongdoing be substantiated or even probable;[146] they only need be credible. One of the reasons why Delaware courts urge stockholders to conduct pre-suit investigations is to investigate allegations before filing plenary litigation to determine whether they are substantiated. In furtherance of that objective, this court attempts to avoid "placing an unduly difficult obstacle in the path of stockholders seeking to investigate . . . mismanagement."[147] The allegations, information, and evidence in the complaints on which Plaintiffs rely meet this standard for the reasons discussed above.

---

[144] *Id.* ¶ 64 & n.2 (citing "Open Payment" information, which is defined as "payments that are not associated with a research study such as compensation, food and beverage and lodging"); *id.* ¶ 69 (listing 2017 advisory boards and each of their composition); *id.* ¶ 76 (listing prices of drugs at issue in the litigation); *id.* ¶ 134 (quoting an internal email that allegedly read: "Let them hear the Message for $3,000").

[145] *See* Def.'s Answering Br. at 5–22.

[146] *See supra* notes 102–09 and accompanying text.

[147] *See Thomas & Betts*, 681 A.2d at 1032.

31

Requiring that Plaintiffs demonstrate more would place "an unduly difficult obstacle" in the path of stockholders.

The parties also dispute whether Plaintiffs have presented evidence demonstrating that Gilead's board of directors and senior officers were aware of the categories of alleged wrongdoing.[148] Such a showing is not required to support a credible basis where, as here, Plaintiffs have not limited their purposes to pursuing derivative claims.[149] If Plaintiffs must demonstrate a credible basis to suspect wrongdoing at the level of the board or senior management, then they have done so. Gilead's HIV drugs generate 73% of Gilead's revenue and were thus "intrinsically critical to the company's business operation."[150] There is thus a credible basis to suspect that the board and senior management knew about the possible wrongdoing. If they did not, there is a credible basis to suspect that they failed to monitor a business segment that was "mission critical," as well as vitally important to the lives of millions of people.[151]

### 2. Plaintiffs' Purposes Are Their Own.

Only one Plaintiff must demonstrate a proper purpose for the court to grant some level of inspection. Thus, for Gilead to avoid inspection entirely, Gilead must accomplish the difficult task of undermining all five Plaintiffs' purposes. Gilead's primary argument

---

[148] *See* Pls.' Opening Br. at 15–17; Def.'s Answering Br. at 14–15.

[149] *See AmerisourceBergen*, 2020 WL 132752, at *15, *19.

[150] *See Marchand v. Barnhill*, 212 A.3d 805, 822 (Del. 2019); *accord. In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967–70 (Del. Ch. 1996).

[151] *See Marchand*, 212 A.3d at 824.

toward this end is that each Plaintiff was a passive conduit in a purely lawyer-driven endeavor and thus lacks a proper purpose under *Wilkinson v. A. Schulman, Inc.*[152] Gilead bears the burden of proving this defense.[153]

In *Wilkinson*, the plaintiff's deposition testimony revealed a discrepancy between the plaintiff's actual purpose and the stated purpose in the demand.[154] The plaintiff wanted to investigate the company's negative financial results, but the demand sought to investigate a board decision to accelerate equity awards.[155] Wilkinson's counsel had ignored his client's purpose and chose to send a demand concerning the counsel's purpose.[156] The disconnect between the client and counsel persisted through the Section 220 enforcement action.[157] Wilkinson verified the complaint, but he did nothing to confirm the accuracy of its allegations and knew nothing about the inspection process or litigation.[158] He failed to play any meaningful role in the litigation and testified that he was unaware of any facts concerning the wrongdoing that his counsel sought to

---

[152] *See* Def.'s Answering Br. at 22–36 (citing 2017 WL 5289553 (Del. Ch. Nov. 13, 2017)).

[153] *See Inter-Local Pension Fund GCC/IBT v. Calgon Carbon Corp.,* 2019 WL 479082, at *9 (Del. Ch. Jan. 25, 2019) ("A corporate defendant may resist demand where it shows that the stockholder's stated proper purpose is not the actual purpose for the demand. However, in order to succeed, the defendant must prove that the plaintiff pursued its claim under false pretenses. Such a showing is fact intensive and difficult to establish." (internal quotation marks omitted)), *aff'd* 237 A.3d 818 (Del. 2020).

[154] *See Wilkinson*, 2017 WL 5289553, at *2–3.

[155] *Id.*

[156] *Id.*

[157] *See id.*

[158] *Id.* at *3.

33

investigate.[159]  This confluence of unusual facts led the court to find that the plaintiff lacked a proper purpose.[160]

Gilead fails to prove that the facts of this case rise to the level seen in *Wilkinson*.  In this case, Plaintiffs testified that they actually sought to investigate wrongdoing.[161]  They reviewed their respective Demands and complaints prior to authorizing their service and filing.[162]  For the most part, they were knowledgeable about the basis for their Demands.[163]  They remained in contact with their respective counsel throughout the demand process and litigation.[164]  This testimony is sufficient to establish that Plaintiffs' purposes are their own.

---

[159] *Id.* at *2–3.

[160] *See id.* at *2–4; *see also Calgon Carbon,* 2019 WL 479082, at *9 (noting that the "misalignment of goals between the stockholder and his counsel was a key factor in the [*Wilkinson*] Court's determination that there was no proper purpose for the demand.").

[161] *See* Collins Dep. Tr. at 86:22–87:11; Friedt Dep. Tr. at 65:24–66:8; Pettry Dep. Tr. at 77:5–78:11; Trial Tr. at 12:23–13:15 (Ramirez); Ramirez Dep. Tr. at 87:15–19, 98:6–7, 119:9–22; Williams Dep. Tr. at 57:22–58:10.

[162] *See* Collins Dep. Tr. at 67:21–24; Friedt Dep. Tr. at 74:18–22, 111:18–112:12, 124:42–125:2; Pettry Dep. Tr. at 59:15–61:21, 101:9–18; Trial Tr. at 12:20–22 (Ramirez); Ramirez Dep. Tr. at 58:22–24; Williams Dep. Tr. at 54:21–24, 77:5–18.

[163] *See* Collins Dep. Tr. at 95:17–113:22; Pettry Dep. Tr. at 79:16–82:17; Trial Tr. at 12:23–13:15, 32:5–34:4 (Ramirez); Ramirez Dep. Tr. at 50:22–53:4, 87:15–93:18; Williams Dep. Tr. at 58:21–62:13.  Although Friedt demonstrated a general understanding the subject matter of her demand (*see* Friedt Dep. Tr. at 65:24–66:8), her knowledge of the basis for her demand was exceptionally weak; this fact standing alone does not compare to the confluence of unusual facts present in *Wilkinson*.

[164] *See* Collins Dep. Tr. at 40:3–122:9; Friedt Dep. Tr. at 61:9–125:2; Pettry Dep. Tr. at 53:6–81:18; Trial Tr. at 10:10–23, 14:8–15:8, 23:20–24:6, 41:20–42:20 (Ramirez); Ramirez Dep. Tr. at 56:5–213:9; Williams Dep. Tr. at 23:4–85:24.  Gilead accuses Collins of lying about who initiated the process and his level of involvement based mostly on Collins' poor recall of demands he served on Gilead in 2016 and 2018 and his lack of direct contact with litigation counsel.  *See* Def.'s Answering Br. at 28–31.  But those demands are largely irrelevant, and Collins' sworn testimony established that he had reviewed the

34

To be sure, Gilead proved that lawyers were heavily involved in the process, but that is to be expected considering the significant role lawyers play in representative litigation generally.

On that point, *In re Fuqua Industries, Inc. Shareholder Litigation*[165] is instructive. There, former Chancellor Chandler denied a motion to disqualify a derivative plaintiff who was unfamiliar with the basic facts of the case and largely deferred control of the litigation to counsel.[166] After canvasing state and federal case law concerning the adequacy standard imposed on derivative plaintiffs, the court held that the plaintiffs' bare knowledge of the "basic facts" was sufficient to meet the adequacy requirement, and that knowledge of "the particulars" was not required.[167] In reaching this conclusion, the court observed that Delaware law provides incentives for private attorneys to bring derivative suits as a solution to the collective action problem, that those attorneys naturally play a "dominant role in prosecuting litigation on behalf of clients," and that lawyer involvement is particularly appropriate "in cases involving fairly abstruse issues of corporate governance and fiduciary duties."[168]

---

demand letters sent on his behalf and maintained contact with his referring counsel. *See* Collins Dep. Tr. at 40:3–122:9. This is sufficient to support the finding that Collins' stated purposes were his own.

[165] 752 A.2d 126 (Del. Ch. 1999).

[166] *Id.* at 134–37.

[167] *Id.* at 136 ("[The plaintiff] was at times quite lucid and able to independently communicate the basic facts and claims underlying her lawsuit. She did not know the particulars.").

[168] *Id.* at 135; *id.* at 133 ("Our legal system has privatized in part the enforcement

Of course, the adequacy requirement of Court of Chancery Rule 23.1 at issue in *Fuqua* and the proper purpose requirement of Section 220 at issue in this case are not the same. This decision does not suggest otherwise. The point is that Delaware courts have encouraged stockholders to pursue Section 220 actions in advance of derivative suits for decades.[169] It would be inconsistent with this policy to require that Section 220 plaintiffs know more than what is required of derivative plaintiffs. It would also be inconsistent with this policy to prohibit lawyers from playing a "dominant role" in Section 220 actions while permitting them to do so in derivative litigation. This is particularly so given the increasing complexities plaguing Section 220 actions.[170]

_____

mechanism . . . by allowing private attorneys to bring suits on behalf of nominal shareholder plaintiffs."); *see also In re Del Monte Foods Co. S'holders Litig.*, 2011 WL 2535256, at *14 (Del. Ch. June 27, 2011) ("Delaware courts recognize the value of representative litigation."); *In re Revlon, Inc. S'holders Litig.*, 990 A.2d 940, 959 (Del. Ch. 2010) ("[R]epresentative litigation serves as a valuable check on managerial conflicts of interest. Stockholder plaintiffs can and do achieve meaningful results." (citation omitted)); *Bird v. Lida, Inc.*, 681 A.2d 399, 402–03 (Del. Ch. 1996) (explaining that entrepreneurial plaintiff attorneys can "pursue monitoring activities that are wealth increasing for the collectivity (the corporation or the body of its shareholders)").

[169] *See, e.g.*, *Cal. State Tchrs.' Ret. Sys. v. Alvarez*, 179 A.3d 824, 839 (Del. 2018) ("[T]his Court has repeatedly admonished plaintiffs to use the 'tools at hand' and to request company books and records under Section 220 to attempt to substantiate their allegations before filing derivative complaints."); *Sec. First Corp.*, 687 A.2d at 571 (Del. 1997) ("[A] Section 220 proceeding may serve a salutary mission as a prelude to a derivative suit."); *Ash v. McCall*, 2000 WL 1370341, at *15 n.56 (Del. Ch. Sept. 15, 2000) ("As the Delaware Supreme Court has repeatedly exhorted, shareholders plaintiffs should use the 'tools at hand,' most prominently § 220 books and records actions, to obtain information necessary to sue derivatively.").

[170] *See, e.g.*, *Wilkinson*, 2017 WL 5289553, at *3 ("A stockholder obviously can use counsel to seek books and records. Section 220 expressly contemplates that a stockholder can make a demand 'in person or by attorney or other agent.' Indeed, given the complexity of Delaware's sprawling Section 220 jurisprudence, a stockholder is well-advised to secure

36

The incentives in representative litigation are imperfect, and judicial oversight is required in Section 220 actions as elsewhere. In *Fuqua*, the court went on to admonish the plaintiffs' counsel for effectively "supplanting" his client in a deposition, explaining that "extreme facts call for the court to exercise its discretion and to curb the agency costs inherent in private regulatory and enforcement mechanisms."[171] It was similarly extreme facts that drove the outcome in *Wilkinson*, where the attorneys disregarded their client's objectives entirely and pursued their own.[172]

In this case, the degree of lawyer involvement does not come close to the line-crossing conduct at issue in *Fuqua* or *Wilkinson*. This case reflects benign manifestations of the role that plaintiffs' law firms play generally in representative litigation.

Gilead singles out Pettry and Friedt because they were enrolled in a portfolio monitoring program and had no knowledge of alleged wrongdoing at Gilead before counsel contacted them.[173] But there is nothing inappropriate about such programs. They are

---

counsel's assistance." (quoting 8 *Del. C.* § 220(b)); *Calgon Carbon*, 2019 WL 479082, at \*10 (holding that stockholders are entitled to rely on counsel "to raise concerns, to advise them on how to remedy those concerns, and to pursue appropriate remedies"); *Kosinski v. GGP Inc.*, 214 A.3d 944, 951–52 (Del. Ch. 2019) ("The fact that Plaintiff sought and accepted the advice of counsel is to his credit, not his detriment."); *see also* Cox et al., *supra* note 6, at 2150 (attributing the increased complexity in Section 220 actions to the fact that "defendants have turned books and records litigation into a surrogate proceeding to litigate the possible merits of the suit where they place obstacles in the plaintiffs' way to obstruct them from employing it as a quick and easy pre-filing too").

[171] *Fuqua*, 752 A.2d at 133–34.

[172] *See Wilkinson*, 2017 WL 5289553, at \*2–3.

[173] *See* Def.'s Answering Br. at 24–28; Trial Tr. at 147:9–16; *id.* at 149:22–150:4; Friedt Dep. Tr. at 61:24–64:9; Pettry Dep. Tr. at 38:12–22, 40:19–41:22, 75:10–19.

voluntary and serve the purpose of keeping stockholders abreast of corporate developments that may affect the value of their stock holdings. They do not obligate participants to send Section 220 demands or file suits.[174]

Gilead also complains about Hollywood's involvement in portfolio monitoring programs,[175] but those arguments are similarly misguided. Hollywood is a police officers' retirement fund that is run by a seven-member Board of Trustees, all of whom are volunteers.[176] Hollywood works with portfolio monitoring counsel, who raise potential issues with Hollywood, first by bringing them the attention of Hollywood's outside general counsel.[177] If the general counsel determines that the matter is worthy of consideration, he elevates the discussion first to the Chairman of the Board and then to the Board to make the determination of whether to take action.[178] Hollywood followed its process in this

---

[174] *See Calgon Carbon*, 2019 WL 479082, at *10 ("Advice from counsel comes in many forms. Individual stockholders and smaller institutions cannot be expected to have an independent, in-house team to cultivate purely homegrown legal analyses of their investments. Stockholders are entitled to hire counsel to review and monitor their portfolios for potential mismanagement or wrongdoing. They are also entitled to rely on that counsel to raise concerns, to advise them on how to remedy those concerns, and to pursue appropriate remedies.").

[175] *See* Def.'s Answering Br. at 31–33; Trial Tr. at 156:15–158:22.

[176] *See* Williams Dep. Tr. at 22:23–23:3, 42:1–11; *see also id.* at 25:7–9 ("Q. Who at Hollywood has decision-making authority with respect to litigation decisions? A. That would be the board of trustees.").

[177] *Id.* at 41:13–21.

[178] *Id.* at 55:11–56:7.

case,[179] and that process is sound. Like boards of Delaware corporations,[180] boards of pension funds are encouraged to rely on professional advisors when fulfilling their duties to act in the best interests of the retirees. Hollywood's reliance on professional advisors, including portfolio monitoring counsel, strengthens the integrity of Hollywood's purpose, not the opposite.

Demonstrating how far Gilead was willing to go in attacking Plaintiffs, Gilead tries to impugn Ramirez's testimony based on a cut-and-paste error in Ramirez's retainer agreement with counsel.[181] The error (failing to replace the word "opioid") was made by counsel—not Ramirez.[182] Ramirez explained that he was caught by surprise when asked about the error at his deposition; the "curveball," as he called it, confused him because this case has nothing to with opioids.[183] Ramirez confirmed throughout his deposition and trial testimony that his aim in seeking records was true, even stating that he was inspired by an article he read related to wrongdoing related to Gilead's HIV drugs.[184]

In the end, Gilead failed to establish that any Plaintiff's lawyers' involvement undermined any Plaintiff's purpose (much less all of them). The record reflects that each

---

[179] *See* JX-129 at 1; Williams Dep. Tr. 56:8–57:3.

[180] *See, e.g.,* 8 *Del. C.* § 141(e).

[181] *See* Trial Tr. at 39:21–40:8 (Ramirez).

[182] *See id.* at 10:19–11:11, 40:16–21 (Ramirez).

[183] *Id.* at 13:13–15, 32:5–34:4 (Ramirez).

[184] *See id.* at 12:23–13:15 (Ramirez); Ramirez Dep. Tr. at 87:15–19, 98:6–7, 119:9–22.

Plaintiff genuinely holds its stated purpose of investigating possible wrongdoing in the development and commercialization of Gilead's HIV treatments.

## B. Gilead's So-Called "Standing" Arguments

In its second attack on Plaintiffs' purposes, Gilead argues that "Plaintiffs' Demands are defective because Plaintiffs lack standing to investigate the claimed wrongdoing."[185] This is so, according to Gilead, because any derivative claims challenging the wrongdoing at issue would be dismissed for the following reasons: (i) Plaintiffs did not own shares at the time of the alleged wrongdoing;[186] (ii) the derivative claims they seek to pursue are time-barred;[187] and (iii) any derivative claims they seek to pursue would be barred by an exculpatory charter provision.[188]

---

[185] Def.'s Answering Br. at 36.

[186] *See id.* at 36 (citing *Graulich v. Dell Inc.*, 2011 WL 1843813, at *5 (Del. Ch. May 16, 2011) ("If plaintiff would not have standing to bring suit, plaintiff does not have a proper purpose to investigate wrongdoing because its stated purpose is not reasonably related to its role as a stockholder."); *W. Coast Mgmt. & Cap., LLC v. Carrier Access Corp.*, 914 A.2d 636, 641 (Del. Ch. 2006) ("If a books and records demand is to investigate wrongdoing and the plaintiff's sole purpose is to pursue a derivative suit, the plaintiff must have standing to pursue the underlying suit[.]")); *id.* at 37–38.

[187] *See id.* at 36 (citing *Graulich*, 2011 WL 1843813, at *6 (denying Section 220 demand where "plaintiff ha[d] articulated no stated purpose other than to investigate wrongdoing in order to bring an appropriate suit against defendant, and plaintiff [was] time-barred from bringing that suit")); *id.* at 39–43.

[188] *See id.* at 43 n.26 (citing *Se. Pa. Transp. Auth. v. Abbvie Inc.*, 2015 WL 1753033, at *13 (Del. Ch. Apr. 15, 2015) (investigating corporate wrongdoing and waste were not proper purposes when the facts alleged amounted to only a possible breach of the duty of care, damages for which would be barred by the corporation's exculpation clause)).

40

Gilead devoted extensive resources to this argument. To support it, Gilead served discovery, brought a motion to compel, and took five depositions. Gilead explored these issues at trial and devoted eight pages of post-trial briefing to them.[189]

There are a number of vexing aspects of this argument. For starters, although certain of these points may speak to a plaintiff's standing to pursue a derivative suit, they do not speak to a plaintiff's standing to pursue a Section 220 action. Under Delaware law, "[t]he issue of standing is concerned 'only with the question of *who* is entitled to mount a legal challenge and not with the merits of the subject matter in controversy.'"[190] Where the right at issue is statutory, "the real determinant" of standing "is the statutory language itself."[191] Section 220(c) answers the question of *who* has standing to pursue an enforcement action under Section 220(c)—a stockholder.[192] In this case, it is undisputed that each Plaintiff held stock when filing their complaints (and also for significant periods prior to filing the complaints).[193]

---

[189] *See* Trial Tr. at 185:4–190:15; Def.'s Answering Br. at 36–43.

[190] *Dover Hist. Soc'y v. City of Dover Plan. Comm'n*, 838 A.2d 1103, 1110 (Del. 2003) (quoting *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991)).

[191] *Oceanport Indus., Inc. v. Wilm. Stevedores, Inc.*, 636 A.2d 892, 900 (Del. 1994); *Newark Landlord Assoc. v. City of Newark*, 2003 WL 21448560, at *5 (Del. Ch. June 13, 2003).

[192] *See* 8 *Del. C.* § 220(c) (providing that "[i]f the corporation . . . refuses to permit an inspection sought by a stockholder . . . *the stockholder* may apply to the Court of Chancery for an order to compel such inspection" (emphasis added)); *see also Weingarten v. Monster Worldwide, Inc.*, 2017 WL 752179, at *5 (Del. Ch. Feb. 27, 2017) ("[T]he legislature has made clear that only those who are stockholders at the time of filing have standing to invoke this Court's assistance under Section 220.").

[193] Collins has held Gilead stock since 1999, except for a five-month period in 2008. JX-

41

Gilead's arguments speak not to Plaintiffs' standing to pursue a Section 220 action but, rather, to the viability of derivative claims that Plaintiffs might pursue in the future. "This Court has repeatedly stated that a Section 220 proceeding does not warrant a trial on the merits of underlying claims."[194] Yet Gilead pushes the court do just that—evaluate, in the context of a summary proceeding, defenses to causes of action that have not yet been asserted and might have never been asserted.

---

52. Friedt has held Gilead stock since 2013. *See* JX-157 at 9; Friedt Dep. Tr. at 31:15–19, 38:13–22. Pettry has held Gilead stock since 2016. *See* JX-155 at 9; Pettry Dep. Tr. at 43:7–16. Ramirez has held Gilead stock since 2016. *See* JX-46; Ramirez Dep. Tr. at 27:3–15. Hollywood has held Gilead stock since 2010. JX-161 at 9.

[194] *In re UnitedHealth Gp., Inc. Section 220 Litig.*, 2018 WL 1110849, at *7 & n.95 (Del. Ch. Feb. 28, 2018) (Montgomery-Reeves, V.C.) (collecting cases); *see also Lavin*, 2017 WL 6728702, at *9 (Slights, V.C.) (holding that a *Corwin* defense will not impede an otherwise properly supported demand for inspection and observing that "when a stockholder demands inspection as a means to investigate wrongdoing in contemplation of a class or derivative action, Delaware courts generally do not evaluate the viability of the demand based on the likelihood that the stockholder will succeed in a plenary action"); *Amalgamated Bank v. UICI,* 2005 WL 1377432, *2 (Del. Ch. June 2, 2005) (Noble, V.C.) ("The potential availability of affirmative defenses to withstand fiduciary duty claims cannot solely act to bar a plaintiff under Section 220. First, these are summary proceedings; the factual development necessary to assess fairly the merits of a time-bar affirmative defense, for example, as to each potential claim, is not consistent with the statutory purpose. Second, courts should not be called upon to evaluate the viability of affirmative defenses to causes of actions that have not been, and more importantly may not ever be, asserted. Third, that a claim arising out of a particular transaction may be barred does not mandate the conclusion that documents relating to that transaction are not 'necessary, essential, and sufficient' for a shareholder's proper purpose with respect to more recent transactions."); *LAMPERS*, 2007 WL 2896540, at *12 (Noble, V.C.) (rejecting, in a Section 220 proceeding, that no springloading ever occurred because "by raising such a defense, Countrywide seeks to litigate the ultimate issue in a possible future derivative suit that might eventually be filed by LAMPERS" and holding that "[t]his is neither the time nor the procedural setting to address that issue").

Beyond the obvious practical concerns raised by such an approach, the theoretical problems with Gilead's argument are rife, as Vice Chancellor Laster persuasively explained in *AmerisourceBergen*.[195]  As the court held in *AmerisourceBergen*, a defense to a future derivative claim affects a stockholder's ability to invoke Section 220 only where the stockholder identifies pursuing a derivative claim as its *sole* purpose, as was the case in *Graulich* and *West Coast Management*.[196]  In this case, Plaintiffs did not limit themselves to the sole purpose of pursuing derivative claims.[197]  Rather, Plaintiffs

---

[195] *See AmerisourceBergen*, 2020 WL 132752, at *14–24; *see also Okla. Firefighters Pension & Ret. Sys. v. Citigroup Inc.*, 2014 WL 5351345, at *6 (Del. Ch. Sept. 30, 2014) ("Although Citigroup disclaims any effort to turn this proceeding into a trial on the merits of Plaintiffs possible derivative claims, Citigroup essentially seeks that result by implying that Plaintiff must have specific, tangible evidence that Citigroup's Board or senior management was complicit in the fraud at Banamex.  That argument ignores the inferences that this Court can—and must—draw under the credible basis standard, and would discourage the very behavior this Court has sought to encourage among would-be derivative or class plaintiffs.").

[196] *See Graulich*, 2011 WL 1843813, at *5 ("[P]laintiff's *only* purpose is to pursue potential derivative claims." (emphasis added)); *W. Coast Mgmt.,* 914 A.2d at 641 ("It is clear that West Coast's *sole purpose* for investigating claims of wrongdoing is to obtain additional information to replead demand futility in order to pursue a second derivative suit." (emphasis added)).  To be clear, a Section 220 plaintiff is not required to limit the end-uses of the information they seek at the outset of their investigation.  *AmerisourceBergen* 2020 WL 132752, at *12 (holding that the proper purpose requirement does not require a stockholder to pick one of these end-uses at the outset, or "commit in advance to what it will do with an investigation before seeing the results of the investigation").

[197] *See* Def.'s Answering Br. at 37 (acknowledging that "Plaintiffs claim that their purposes 'are not limited to bringing a derivative lawsuit'" (citing Pls.' Opening Br. at 46)); JX-123 at 2 (Ramirez's demand stating that if the investigation supports doing so, he "*may* use the documents to pursue a shareholder derivative action" (emphasis added)); JX-128 at 15 (Collins's demand stating that the information sought will enable him "to determine whether wrongdoing or mismanagement has taken place such that it would be appropriate to initiate litigation"); JX-108 at 1 (Pettry's demand listing "presenting a litigation demand to the Board" or "suggesting corporate governance reforms" as other potential end uses of

43

expressly identified multiple potential end-uses for the information obtained through their investigations.[198]

Gilead acknowledges that Plaintiffs have stated multiple potential end-uses for the information obtained through their investigations,[199] but Gilead pivots to argue that "it is *obvious* based on Plaintiffs' [i] deposition testimony, coupled with their [ii] retention agreements, that their *only true purpose is to pursue such a lawsuit.*"[200]

A review of Plaintiffs' testimony and a close examination of Gilead's citations reveal that Gilead's position is unsupported and its citations are misleading. As an initial matter, although Gilead makes this point as to "Plaintiffs" as a whole, Gilead does not cite to any deposition testimony from one of the five Plaintiffs—Hollywood.[201] Nor could they. Hollywood's 30(b)(6) representative Williams testified that he had not predetermined what would happen after the investigation.[202] Williams, a retired police officer, expressly

---

the fruits of their investigation); JX-113 at 1 (Friedt's demand listing "presenting a litigation demand to the Board" or "suggesting corporate governance reforms" as other potential end uses of the fruits of their investigation); JX-124 at 1 (Hollywood's demand expressly stating that Hollywood reserves the right to "take other action to seek appropriate relief").

[198] *See* Pls.' Opening Br. at 25–45.

[199] *See* Def.'s Answering Br. at 37 (acknowledging that "Plaintiffs claim that their purposes 'are not limited to bringing a derivative lawsuit'" (citing Pls.' Opening Br. at 46)).

[200] *Id.* (emphasis added).

[201] *See id.* at 36–43.

[202] *See* Williams Dep. Tr. at 58:1–10 ("Well, as I understand it, it's similar to a police investigation, if you will. If there is some wrongdoing that's being alleged, there's an investigation that follows. That investigation may turn out to be completely prudent. Any and all the action taken was in the best interests of the company. And as I stated before, if there's nothing there, then we move on. If it turns out that there's wrongdoing, then the

likened a Section 220 inspection to a police investigation, and stated that "[t]his is simply an investigation. If it turns out that there is no [wrongdoing], then it will be the end of it."[203] Gilead can only avoid inspection if it defeats all five Plaintiffs' proper purposes. By failing to show that Hollywood had predetermined what to do with the fruits of its investigation, Gilead's argument falls short from the get-go.

Gilead's other citations amount to misrepresentations of the record. For the position that it is "obvious" from "Plaintiffs' deposition testimony" that Plaintiffs' "only true purpose" was to pursue derivative claims, Gilead offers the following:

- Gilead cites to the portion of Collins's testimony where Collins directly denies any plans to file a derivative claim.[204] The examining attorney asked: "Do you intend to file a derivative action against Gilead?" Collins responded: "I don't have any plans to do that at the moment."[205] The attorney continued: "Are you aware of any other Gilead stockholders who are contemplating bringing a derivative action against Gilead?" He responded: "No, I'm not."[206]

- Gilead cites to the portion of Pettry's testimony where she directly denies that her purpose is limited to pursuing a derivative claim.[207] The examining attorney asked: "Now, at the time you entered into this engagement agreement [with counsel], did you intend to file derivative litigation relating to Gilead?" Pettry answered: "It was a matter of *first finding out*. I mean, obviously, although it's *potentially* a shareholder derivative matter, clearly

---

matter would be brought back to the board for any other consideration.").

[203] *Id.* 52:1–3; *see also id.* at 51:10–17 ("Q. And when you say 'the action,' what do you mean by that? A. The books and records investigation involving Gilead. Q. Has Hollywood considered bringing a derivative lawsuit related to the allegations in the Section 220 demand letter? A. No.").

[204] Def.'s Answering Br. at 37 (citing Collins Dep. Tr. at 103–05).

[205] Collins Dep. Tr. at 104:19–23.

[206] *Id.* at 105:1–4.

[207] Def.'s Answering Br. at 37 (citing Pettry Dep. Tr. at 64–65).

there was first to do inspection demand to get information in order to determine *whether* it's appropriate to file derivative, shareholder litigation."[208]

- Gilead cites to the portion of Ramirez's deposition transcript where Ramirez uses equivocal language when referring to a future derivative lawsuit.[209] Counsel for the defendants identified each category of documents requested in Ramirez's demand and asked: "[F]or what purpose do you need this information?"[210] In response to the first few such questions, Ramirez vaguely indicated that he believed that the information would strengthen his "case."[211] In response to the last such question, Ramirez went further to say that he believed the information would strengthen the allegations for the purpose of a potential lawsuit, but he used conditional language, stating: "*if there is a case to be brought.*"[212] The reference to a "case to be brought" called for a follow-up question, which counsel eventually asked: "What specific case are you talking about."[213] Ramirez responded by claiming privilege, but again using conditional language: "I think any of the discussions about any potential case, *if there is to be one*, were between my counsel and I. So I don't know if I can properly answer that for you."[214] The examining attorney let the questioning end there.[215]

- Gilead cites to the portions of Friedt's testimony where Friedt suggests that she will rely on her counsel in determining the end-uses of her investigation.[216] The lead-off question in this series, which the examiner required a "yes or no" response, was: "[H]ave you informed Gilead that you

---

[208] Pettry Dep. Tr. at 64:23–65:8 (emphasis added).

[209] Def.'s Answering Br. at 37 (citing Ramirez Dep. Tr. at 102–12).

[210] Ramirez Dep. Tr. at 107:21–22, 108:19–20, 110:1–2.

[211] *See id.* at 108:3–5 ("I think they could help strengthen our case against the allegations."); *id.* at 109:15–17 ("As I had previously stated, I believe they could shed some light and strengthen our case."); *id.* at 110:15–17 ("I would again say adding merit and strength to the allegations that were present . . . for all the points as like a collective.").

[212] *Id.* at 111:18–21 (emphasis added) ("[A]s previously stated, these conversations could add merit and strength to our allegations, if there is to be a case brought.").

[213] *Id.* at 112:14–15.

[214] *Id.* at 112:16–20 (emphasis added).

[215] *See id.*

[216] Def.'s Answering Br. at 37 (citing Friedt Dep. Tr. at 54–56).

may file a derivative action against it?"[217] To this question, Friedt responded "[t]hrough counsel, yes," and then said "I left it up to my counsel to inform Gilead."[218] The examiner had not previously asked whether Friedt had considered filing a derivative claim, and thus the question assumed aspects of the very fact that Gilead seeks to prove—Friedt's intent to pursue derivative claims. Moreover, on its face, this examiner's question only asks whether Friedt "*may*" file a derivative action, and not that she has predetermined that a derivative claim is the only end-use she intended to pursue. Friedt later clarified, in other pages specifically relied on by Gilead, that she intended to leave it to her counsel to determine whether to pursue derivative claims, implicitly denying any then-present intention of pursuing derivative claims.[219]

This deposition testimony does not support, and portions directly contradict, Gilead's contention that Plaintiffs' "only true purpose" is to pursue a derivative lawsuit.

Plaintiffs' retention agreements with counsel similarly fail to demonstrate that Plaintiffs' sole purpose was to pursue a derivative suit. Gilead argues that "the retention agreements make clear that counsel will not be paid until Plaintiffs achieve a financial settlement or judgment—an implausible scenario absent the prosecution of derivative claims."[220] Once again, Gilead fails to make this point as to all Plaintiffs—only four of the

---

[217] Friedt Dep. Tr. at 54:1–5.

[218] *Id.* at 54:9–15.

[219] *Id.* at 81:4–9 ("Q. At the time you entered into this engagement agreement, did you intend to file a derivative action relating to Gilead . . . ? A. . . . I would leave that up to my counsel.").

[220] Def.'s Opening Br. at 37 (citing JX-79 at 2 (Friedt Retention Agreement); JX-80 at 2 (Pettry Retention Agreement); JX-87 at 1–2 (Ramirez Retention Agreement); JX-122 at 2 (Hollywood Retention Agreement)).

five Plaintiffs executed retention agreements with counsel.[221] Collins represented that he did not have a retention agreement with counsel.[222]

It is true that plaintiffs' attorneys commonly take matters on contingency and receive compensation only as a consequence of the prosecution and settlement of derivative claims. This common arrangement is, again, a benign aspect of Delaware's solution to the collective action problem that stockholders face. Moreover, the fact that retention agreements with counsel provide that counsel only gets paid in the event of plenary litigation does not prevent Plaintiffs from using "the fruits of their investigation for other ends."[223] It is logical that the agreements would address litigation because "[t]he plaintiffs would need their counsel to conduct litigation," but not to pursue alternative courses of action.[224] The retention agreements standing alone, therefore, do not undermine Plaintiffs' proper purposes.

To sum up the defects in Gilead's so-called "standing" arguments as a whole: They are not actually about standing to bring a Section 220 action. They speak to the viability of a derivative claim, which is largely beyond the scope of Section 220 proceedings. Even the authorities on which Gilead relies limit the application of Gilead's arguments to situations where pursuing a derivative claim is the plaintiff's sole purpose. Section 220

---

[221] *See* JX-79 (Friedt Retention Agreement); JX-80 (Pettry Retention Agreement); JX-87 (Ramirez Retention Agreement); JX-122 (Hollywood Retention Agreement).

[222] Collins Dep. Tr. at 45:19–24.

[223] *See AmerisourceBergen*, 2020 WL 132752 at *14.

[224] *Id.*

plaintiffs generally need not specify the end-uses of their investigation at the outset of their investigation, and Plaintiffs here have stated multiple potential end-uses. Gilead's arguments to the contrary based on Plaintiffs' deposition testimony fail to address all Plaintiffs and are misleading. Plaintiffs' retention agreements with their counsel do not support Gilead's point.

Gilead's arguments fail for other reasons as well. Gilead argues that Plaintiffs lack standing to seek inspection because Plaintiffs did not own shares at the time of the possible wrongdoing.[225] Yet, in *Saito*, the Delaware Supreme Court found that "the date on which a stockholder first acquired the corporation's stock does not control the scope of records available under § 220."[226] As the court explained, a stockholder can seek inspection of records pre-dating their stock ownership "[i]f activities that occurred before the purchase date are 'reasonably related' to the stockholder's interest as a stockholder."[227] A document can reasonably relate to a stockholder's current interests if it provides background and context to the current or ongoing wrong the stockholder seeks to investigate.[228] In this

---

[225] *See* Def.'s Answering Br. at 36 (citing *Graulich*, 2011 WL 1843813, at *5 ("If plaintiff would not have standing to bring suit, plaintiff does not have a proper purpose to investigate wrongdoing because its stated purpose is not reasonably related to its role as a stockholder.")); *W. Coast Mgmt.*, 914 A.2d at 641 ("If a books and records demand is to investigate wrongdoing and the plaintiff's sole purpose is to pursue a derivative suit, the plaintiff must have standing to pursue the underlying suit[.]")).

[226] *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 117 (Del. 2002).

[227] *Id.*

[228] *UICI*, 2005 WL 1377432, at *2 ("A document that contributes to the investigation of a continuing wrong or provides background and context to a current, actionable wrong may be relevant and, indeed, necessary to a shareholder's proper purpose regardless of whether

49

case, any records sought that arguably pre-date Plaintiffs' ownership of Gilead stock are "reasonably related" to Plaintiffs' current interest as stockholders, and concern post-purchase date wrongs that have their roots in earlier events.

In any event, Gilead's timing-of-ownership argument does not apply to the on-going False Claim Acts investigations, as the antitrust abuses, mass torts, and patent violations are all alleged to be continuing.[229]

There is also a non-frivolous argument that Gilead waived its statute of limitations and Section 102(b)(7) defenses by failing to identify them in its interrogatory responses, despite this court ordering discovery into Gilead's defenses.[230] Gilead responds that it was not required to raise these defenses in its answer or otherwise because they are not defenses to a books and records action but, rather, to the plenary lawsuit.[231] This decision need not reach this argument given the multiple other defects in Gilead's position. But it bears noting that Gilead's position only underscores that Gilead's "standing" arguments speak to the viability of a potential derivative claim and not Plaintiffs' entitlement to inspection under Section 220.

---

the events revealed in the documents are themselves actionable.").

[229] *See* JX-82 at ¶ 2; JX-98 at 3, 69–75; JX-244 at ¶¶ 155, 163.

[230] *See* JX-164; JX-191; JX-206; JX-210; *see also IQ Hldgs., Inc. v. Am. Com. Lines Inc.*, 2012 WL 3877790, *1 (Del. Ch. Aug. 30, 2012) ("The underlying purpose of discovery in general is to reduce the element of surprise at trial . . . .").

[231] *See* Def.'s Answering Br. at 40 n.23 ("The statute of limitations is not an affirmative defense in a books and records action.").

## C. Scope of Production

Once a Section 220 plaintiff establishes a proper purpose, the court must determine the scope of inspection. A stockholder with a proper purpose "bears the burden of proving that each category of books and records is essential to accomplishment of the stockholder's articulated purpose for the inspection."[232]

The Delaware Supreme Court recently articulated this burden as follows:

> Books and records satisfy this standard "if they address the 'crux of the shareholder's purpose' and if that information 'is unavailable from another source.'" That determination is "fact specific and will necessarily depend on the context in which the shareholder's inspection demand arises." Keeping in mind that § 220 inspections are not tantamount to "comprehensive discovery," the Court of Chancery must tailor its order for inspection to cover only those books and records that are "essential and sufficient to the stockholder's stated purpose." In other words, the court must give the petitioner everything that is "essential," but stop at what is "sufficient."[233]

In this case, Plaintiffs seek inspection of formal board materials, including board minutes, presentations, reports, agendas, and preparation materials, dating back to 2004 and concerning the topics of the Demands. Plaintiffs additionally seek five specific categories of documents.

Gilead's response is three-fold. Gilead first argues that inspection should be limited to formal board materials. Gilead next makes arguments as to each category of additional documents. Gilead finally argues that each Plaintiff should be limited to inspecting only the documents specifically sought in their respective Demands.

---

[232] *Palantir*, 203 A.3d at 751 (quoting *Thomas & Betts*, 681 A.2d at 1035).

[233] *Id.* at 751–52.

### 1. Formal Board Materials

Gilead agrees that, upon a finding that Plaintiffs have stated proper purposes, the production of the formal board materials is appropriate.[234] Gilead has collected and reviewed approximately 1,600 centrally-stored formal board materials from December 1, 2004 to February 25, 2020, and identified over 400 of them as potentially related to the topics sought in the Demands.[235] Because Plaintiffs have stated proper purposes, Plaintiffs are entitled to inspect this category of documents. These documents should have been produced in response to the Demands without resort to litigation.

### 2. Categories of Additional Documents

Gilead argues that the court should limit inspection to formal board materials based on what Gilead describes as the "default rule that only formal board materials are necessary and essential in a Section 220 proceeding."[236] There is no such default rule.

Gilead relies primarily on Vice Chancellor Laster's decision in *AmerisourceBergen*.[237] There, the Vice Chancellor classified corporate books and records

---

[234] Def.'s Answering Br. at 47–50.

[235] JX-210 at 21–23.

[236] Def.'s Answering Br. at 54.

[237] *See id.*

into three categories: "Formal Board Materials,"[238] "Informal Board Materials,"[239] and "Officer-Level Materials."[240] The Vice Chancellor explained that "[t]he starting point (and often the ending point) for an adequate inspection will be board-level documents."[241] The premise for that observation is that companies can and should provide these documents voluntarily without forcing stockholders to litigate over them. Gilead misses this point and invokes the *AmerisourceBergen* taxonomy for a contrary purpose—to broaden the already extensive disputes among the parties.

Formal board materials need not be an end point, particularly where the wrongdoing appears vast. As the Vice Chancellor further explained in *AmerisourceBergen*, "[i]f the plaintiff makes a proper showing, an inspection may extend to informal materials,"[242] and "wide-ranging mismanagement or waste" might require a "more wide-ranging

---

[238] *AmerisourceBergen*, 2020 WL 132752 at *24 (defining "Formal Board Materials" as "board-level documents that formally evidence the directors' deliberations and decisions and comprise the materials that the directors formally received and considered") (collecting cases limiting the scope of production to Formal Board Material); *see also Woods v. Sahara Enters.*, 2020 WL 4200131, at *11 (Del. Ch. July 22, 2020) (same).

[239] *AmerisourceBergen*, 2020 WL 132752 at *25 (defining "Informal Board Materials" as "generally include[ing] communications between directors and the corporation's officers and senior employees, such as information distributed to the directors outside of formal channels, in between formal meetings, or in connection with other types of board gatherings" and sometimes including "emails and other types of communication sent among the directors themselves, even if the directors used non-corporate accounts").

[240] *Id.* (defining "Officer Level Materials" as "communications and materials that were only shared among or reviewed by officers and employees").

[241] *Id.* at *24.

[242] *Id.* at *25.

53

inspection."[243]  In this case, Gilead's efforts to draw the line at formal board materials fall short because Plaintiffs have shown a need for additional categories of documents by demonstrating a credible basis to suspect wide-ranging misconduct and wrongdoing.

In addition to formal board materials, Plaintiffs seek the following categories of documents:  (a) the agreements with other companies at issue in the antitrust litigation; (b) policies and procedures concerning the topics covered in the Demands; (c) senior management materials; (d) communications between Gilead and the government; and (e) director questionnaires.

### a.      Anticompetitive Agreements

Plaintiffs seek to inspect the agreements between Gilead and its competitors at issue in the antitrust litigation.[244]  Plaintiffs suspect that these agreements violated antitrust laws or otherwise perpetuate unlawful anticompetitive activity.[245]   They are core to the wrongdoing Plaintiffs seek to investigate.[246]  They are therefore necessary and essential to Plaintiffs' proper purposes.  They are unlikely to be available from another source. Accordingly, Plaintiffs are entitled to inspect this category of documents.[247]  Because of

---

[243] *Id.* at \*24 (first quoting *Freund v. Lucent Techs., Inc.*, 2003 WL 139766, at \*5 (Del. Ch. Jan. 9, 2003); then citing *Skoglund v. Ormand Indus.*, 372 A.2d 204, 211 (Del. Ch. 1976)).

[244] Pls.' Opening Br. at 56–57.

[245] *Id.*

[246] *See, e.g., AmerisourceBergen*, 2020 WL 132752, at \*28 (ordering inspection of settlement agreements with the DEA to identify the scope of the company's compliance obligations and determine whether the Board willfully disregarded them).

[247] The parties dispute the significance of *AmerisourceBergen* on this category of documents.  In that case, the court ordered inspection of documents related to the defendant's participation in trade associations where the plaintiffs suspected that the

the centrality of these agreements to Plaintiffs' purposes, Gilead should have produced them without resorting to litigation.

In holding that Plaintiffs are entitled to inspect the allegedly anticompetitive agreements, the court does not distinguish between the Gilead/Japan Tobacco agreement and those still at issue in the *Staley* Action. The complete set of agreements is necessary to understanding the pattern of behavior that the Demands seek to investigate.

### b. Policies and Procedures

Plaintiffs seek to inspect Gilead's policies and procedures concerning Gilead's compliance with antitrust regulations and patent law.[248] These requests seek discrete categories of information, which are easy to produce, and where inspection is routinely granted.[249] Gilead argues that the formal board materials from the relevant time period are

---

defendant violated the law by collaborating with trade associations. *See id.* Plaintiffs argue that this outcome weighs in favor of production of the antitrust agreements in this action. Pls.' Opening Br. at 57 n.191. Gilead responds that the Court limited production in *AmerisourceBergen* to formal board materials, and argues that this court should "follow *AmerisourceBergen* and not order the production of the underlying antitrust agreements." Def.'s Answering Br. at 53. Defendant misconstrues *AmerisourceBergen*, where the Court found that "[t]he record is inadequate to determine whether the plaintiffs can inspect any other materials because AmerisourceBergen refused to provide any discovery into what types of books and records exist, how they are maintained, and who has them." *See* 2020 WL 132752, at \*1. The court expressly granted the plaintiffs the ability to seek further discovery to determine what books and records exist. *See id.* at \*29. Here, Plaintiffs obtained that discovery, so there is no need for bifurcation.

[248] Pls.' Opening Br. at 57.

[249] *See, e.g.*, *AmerisourceBergen*, 2020 WL 132752, at \*27 (ordering production of the Amerisourcebergen's written policies regarding its anti-diversion and compliance program); *In re Facebook, Inc. Section 220 Litig. (Facebook 220)*, 2019 WL 2320842, at \*18 (Del. Ch. May 30, 2019) (ordering the production of Facebook's formally adopted policies and procedures regarding data privacy and access to user data, including those

sufficient to understand whether Board and management decisions were made in compliance with Gilead's policies and procedures.[250] But the formal board materials may not reflect what, if any, policies and procedures were in place during that time period. These documents are therefore necessary and essential to Plaintiffs' proper purposes. They are unlikely to be available from another source. Accordingly, Plaintiffs are entitled to inspect this category of documents. This is another category of documents that Gilead should have produced without resorting to litigation.

### c. Senior Management Materials

Plaintiffs seek to inspect two categories of officer-level documents that they refer to as "Senior Management Materials" to determine "whether and to what extent mismanagement occurred and what information was transmitted to Gilead's directors and officers."[251]

This court will permit inspection of officer-level documents under certain circumstances. As the Delaware Supreme Court described in *Saito* when affirming inspection of officer-level documents, "generally, the source of the documents in a corporation's possession should not control a stockholder's right to inspection under

---

promulgated following the entry of the Consent Decree); *UnitedHealth*, 2018 WL 1110849, at *10 (ordering the production of UnitedHealth's policies and procedures regarding Medicare billing); *Lucent*, 2003 WL 139766, at *6 (ordering production of policies and procedures concerning accounting compliance, including policies for (i) preparing revenue "targets" or preparing and disclosing "financial guidance" or projections; and (ii) recognizing revenue, on sales to its distributors).

[250] Def.'s Answering Br. at 53–54.

[251] Pls.' Opening Br. at 60–62.

§ 220."[252] Although inspection of officer-level documents can be appropriate, in general, "the Court of Chancery should not order emails to be produced when other materials (*e.g.*, traditional board-level materials, such as minutes) would accomplish the petitioner's proper purpose, but if non-email books and records are insufficient, then the court should order emails to be produced."[253] The burden lies on Plaintiffs to establish a reasonable basis to suspect that other materials are likely to be insufficient to accomplish the stockholder's proper purpose.

First, Plaintiffs seek approximately thirty sets of materials emailed to senior management members prior to their bi-monthly "Leadership Team Meetings" and ad hoc meetings.[254] Plaintiffs observe that Gilead stores the materials circulated in connection with the bi-monthly meetings in a centralized location.[255] Plaintiffs contend that these materials are likely to include information about the government investigations, the antitrust lawsuits, and Gilead's decision to sue the U.S. government.[256] These thirty sets are necessary and essential to Plaintiffs' ability to investigate whether and to what extent wrongdoing occurred and what information was transmitted to Gilead's directors and

---

[252] *Saito*, 806 A.2d at 118; *accord. Wal-Mart Stores, Inc.*, 95 A.3d at 1273; *see also Woods*, 2020 WL 4200131, at *11; *Mudrick Cap. Mgmt., L.P. v. Globalstar, Inc.*, 2018 WL 3625680, at *9 (Del. Ch. July 30, 2018).

[253] *Palantir*, 203 A.3d at 752–53.

[254] Trial Tr. at 87:7–21; JX-210 at 26, 39.

[255] *See* Pls.' Opening Br. at 62 & n.204; *see also* JX-210 at 40 ("From June 2019 to present, documents may be accessed via OneDrive and projected for shared viewing.").

[256] Pls.' Opening Br. at 60–62.

officers.[257] They are also unlikely to be available from another source. Accordingly, Plaintiffs are entitled to inspect this category of documents.

Second, Plaintiffs request electronically stored information—previously gathered and produced in connection with the congressional investigation, the *Staley* Action, and a 2016 subpoena—from the files of two former inside directors John Milligan and John Martin.[258] Plaintiffs say that Milligan and Martin were highly influential Board members and thus their documents are critical because any wrongdoing will likely involve what these Board members knew.[259] As to this one category, Plaintiffs' efforts fall short. A director's status as a management member or highly influential Board member can sometimes provide a basis for inspecting that director's emails, typically where the director played a key role in the suspected wrongdoing.[260] The mere fact that a director holds a management position or is influential seldom makes their documents necessary and essential to investigating wrongdoing.[261] In this case, Plaintiffs offer no additional justification for

---

[257] *Cf. Facebook 220*, 2019 WL 2320842, at *18 (ordering the production of "electronic communications, if coming from, directed to or copied to a member of the Board, concerning" the plaintiffs' allegations in that case, "to be collected from the following [senior management] custodians: Erskine B. Bowles, Sheryl Sandberg, Alex Stamos, and Mark Zuckerberg").

[258] Pls.' Opening Br. at 61–62; *see also* JX-210 at 27 n.4 (alleging that Milligan and Martin, as former executives, were "custodians in certain Matters by virtue of their roles as Senior Officers).

[259] Pls.' Opening Br. at 61–62.

[260] *See, e.g.*, *Yahoo!*, 132 A.3d at 791–793 (permitting inspection of CEO's "email and other electronic documents" because she "was the principal corporate actor in the hiring process").

[261] *Cf. Kaufman v. CA, Inc. (Kaufman II)*, 905 A.2d 749, 755 (Del. Ch. 2006) (holding that

58

seeking to inspect these documents. Plaintiffs have therefore failed to demonstrate that these emails are necessary and essential to their stated purposes and are not entitled to inspect this category of documents.

### d. Gilead's Communications with the Government

Plaintiffs seek to inspect high-level communications between Gilead and government investigators that state the basis for the ongoing government investigations.[262] This court regularly orders companies to produce communications related to government investigations and litigation in Section 220 cases where those investigations supply or support a credible basis for wrongdoing.[263]

Just as Gilead's policies and procedures are necessary and essential to reveal the degree of Gilead's compliance with internal rules, these documents are necessary and

---

the plaintiff "conflate[d] the usefulness or responsiveness of further discovery . . . with the proper standard of necessity under Section 220" and "[t]hat a document would be potentially discoverable under Rule 34 does not make it necessary and essential under Section 220").

[262] Pls.' Opening Br. at 58–60.

[263] *See, e.g.*, *Facebook 220*, 2019 WL 2320842, at *18 (ordering production of documents and communications related to "investigations conducted by the FTC, DOJ, SEC, FBI and ICO regarding Facebook's data privacy practices"); *China MediaExpress*, 2012 WL 28818, at *6 (ordering production of any materials provided to the United States Patent Office or any patent office in any other country, including the People's Republic of China); *Lucent*, 2003 WL 139766, at *5 (ordering production of "[o]rders and other communications with the SEC concerning its investigation"); *Carapico*, 791 A.2d at 792 (ordering production of "reports presented to or minutes of meetings of the Exchange Board of Governors (or any committees or subgroups thereof) relating to (a) the SEC inquiry, (b) the decision to authorize the settlement of the SEC inquiry, or (c) the impact of the terms of the SEC Order on the business of the Exchange or any of its subsidiaries"); *see also AmerisourceBergen*, 2020 WL 132752, at *25 ("In an appropriate case, an inspection may extend further to encompass communications and materials that were only shared among or reviewed by officers and employees . . . .").

essential to reveal the degree of Gilead's compliance with positive law and government regulations. Considering that the ongoing government investigations supported Plaintiffs' credible basis for inspection, these documents are necessary and essential to assess whether wrongdoing occurred. These communications might also inform whether the Company has taken any steps to address the possible wrongdoing. Ongoing government investigations might threaten Gilead's ability to secure future government funding, which would present a serious problem for Gilead's business.

These documents are therefore necessary and essential to Plaintiffs' proper purposes. They are also unlikely to be available from another source. Accordingly, Plaintiffs are entitled to inspect this category of documents.

### e. Director Questionnaires

Plaintiffs seek to inspect the directors' and officers' questionnaires for each Board member.[264] This court regularly orders companies to produce director questionnaires where a plaintiff has demonstrated a credible basis to suspect possible wrongdoing.[265]

---

[264] Pls.' Opening Br. at 56.

[265] *See, e.g.*, *Facebook 220*, 2019 WL 2320842, at *18 (ordering defendant to produce director questionnaires); *UnitedHealth*, 2018 WL 1110849, at *9 (same); *Lavin*, 2017 WL 6728702, at *14 (same). Often, a stockholder will assert the desire to investigate director independence as a separate purpose for seeking books and records. *See, e.g.*, *Facebook 220*, 2019 WL 2320842, at *1 (one of the plaintiffs' stated purposes was to investigate the independence and disinterest of the board); *UnitedHealth*, 2018 WL 1110849, at *1 (Del. Ch. Feb. 28, 2018) (same); *Lavin*, 2017 WL 6728702, at *1 (Del. Ch. Dec. 29, 2017) (same). In this case, Plaintiffs desire to investigating director independence is a component of investigating the corporate wrongdoing at issue.

60

Because that the Demands investigate alleged violations of positive law and government regulations, understanding the directors' motives and potential conflicts is paramount. Further, the burden on Gilead in producing these documents is minimal. Gilead stores these documents in a central location,[266] so they are easy to locate and produce. They are unlikely to be available from another source. Accordingly, Plaintiffs are entitled to inspect this category of documents.

### 3. Plaintiff-Specific Restrictions on Inspection

Gilead seeks to limit the scope of each Plaintiffs' inspections to the documents requested in their respective Demands.[267] Gilead argues that if a Plaintiff elected not to request a certain category of documents in its Demand, then it conceded that such category of information is nonessential to its stated purpose. Gilead contends that Plaintiffs may not by piggyback on other stockholders' separate Demands.[268]

As a general rule, a stockholder's inspection rights are limited by the scope of the demand letter, and a Section 220 plaintiff will be foreclosed from recasting the scope of its demand at the eleventh hour.[269] The conventional wisdom underlying this rule is that it is

---

[266] JX-210 at 24 n.2.

[267] *See* Def.'s Answering Br. at 45–46.

[268] *Id.* at 46 (first citing *Paraflon Invs., Ltd. v. Linkable Networks, Inc.*, 2020 WL 1655947, at *6 (Del. Ch. Apr. 3, 2020) (refusing to order production of documents not requested in demand); then citing *Fuchs Fam. Tr. v. Parker Drilling Co.*, 2015 WL 1036106, at *4, *7 (Del. Ch. Mar. 4, 2015) (rejecting a Section 220 plaintiff's late-stage attempts to expands its inspection)).

[269] *See, e.g.*, *Fuchs*, 2015 WL 1036106, at *4 (rejecting a Section 220 plaintiff's efforts to expand the scope of requested documents through a supplemental demand sent on the eve of trial); *Quantum Tech. P'rs IV, L.P. v. Ploom, Inc.*, 2014 WL 2156622, at *14 n.118 (Del.

difficult and inefficient for companies to consider the merits of an evolving request. Preventing Section 220 plaintiffs from revising the scope of their demands during litigation promotes the policy of protecting corporations from the burden and additional costs created by these inefficiencies.[270]

This general rule serves to promote litigant and judicial efficiency and is not strictly applied when those purposes are not furthered. For example, Section 220 plaintiffs often lack information about what type of corporate records exist when making their demands. This informational asymmetry can force Section 220 plaintiffs to make broad requests. Tailored discovery in a Section 220 action can allow Section 220 plaintiffs to refine their requests with greater precision and drop requests for non-existent information. The iterative process that occurs through Section 220 discovery thus helps to eliminate pointless

---

Ch. May 14, 2014) ("I note, however, that if Quantum later seeks to inspect information that is not within the categories of information sought in this action, Quantum would need to make a new demand and, if necessary, file a new action."); *Highland Select Equity Fund, L.P. v. Motient Corp.*, 906 A.2d 156, 167 (Del. Ch. 2006), and *aff'd sub nom. Highland Equity Fund, L.P. v. Motient Corp.*, 922 A.2d 415 (Del. 2007) ("None of these revisions adequately address the court's concern as to the breadth of the original demand sued upon or the scope of relief Highland Select continues to seek.").

[270] *Paraflon*, 2020 WL 1655947, at \*6 ("Striking the proper balance between a stockholders' inspection rights and the right of a company's board to manage the corporation without undue interference from stockholders is a core principle in our Section 220 jurisprudence. Limiting inspection to what is specified in a demand letter is a key way of maintaining that balance. A corporate board is entitled to be informed of exactly what the stockholder is demanding to inspect so it can make the call, before litigation, whether to allow inspection or litigate the demand. Holding that inspection will not be ordered unless a request is presented in the stockholder's inspection demand preserves this balance and prevents a demand letter from turning into an iterative, ongoing request for production.").

hypothetical disputes and promote judicial and litigant efficiencies, all good things this court strives to encourage.[271]

To that end, sometimes this court will ask Section 220 plaintiffs to revise their requests to streamline disputes. In *Facebook*, for example, the court required the defendant to respond to a demand as "refined by the parties' several and meet and confer sessions."[272] The "refined" demand was "the version of the Demand that [the defendants] addressed in their pre-trial brief and at trial."[273] The court held: "The scope of documents requested in that version, therefore, has been properly joined for decision."[274]

The general rule does not promote efficiency when applied to coordinated Section 220 actions like this case. Often, corporate actions will draw demands for inspection from multiple plaintiffs. In such cases, Section 220 plaintiffs may agree to coordinate their efforts, or sometimes the court or the defendants will ask the Section 220 plaintiffs to do so. A coordinated approach is almost always desirable because it allows the court to resolve, and the defendant to litigate, and a single Section 220 action rather than multiple actions. A coordinated approach also reduces the likelihood of inconsistent determinations on similar issues.

---

[271] *See, e.g.*, *ATR-Kim Eng Fin. Corp. v. Araneta*, 2006 WL 3783520, at *2 (Del. Ch. Dec. 21, 2006); *Loppert v. WindsorTech, Inc.*, 865 A.2d, 1282, 1290–91 (Del. Ch. 2004); *see also* Dkt. 65, Oral Arg. Re Def.'s Mot. for Protective Order and the Ct.'s Ruling at 9–10, 57–58.

[272] *In re Facebook 220*, 2019 WL 2320842, at *18.

[273] *Id.*

[274] *Id.*

In this case, it was Gilead that asked Plaintiffs to coordinate their litigation efforts, and Plaintiffs agreed.[275] As part of their coordinated process, Plaintiffs worked together to narrow their over sixty overlapping documents requests to a streamlined list.

In this context, limiting Plaintiffs to the documents they demanded before coordination would make no sense. There is no prejudice to Gilead in producing all categories of information deemed necessary and essential to all Plaintiffs. In fact, it would be easier for Gilead to create and track one production set rather than five. Gilead's approach would force the court to conduct four separate scope analyses, defeating some of the judicial efficiencies gained by coordination. It would also risk inconsistent rulings on whether categories of documents were necessary and essential as to certain stockholder plaintiffs but not to others who seek to investigate the same wrongdoing. In sum, strict application of the general rule in this case would defeat the rule's purpose of promote litigant and judicial efficiency.

For this reason, Gilead's final argument seems yet another indication that Gilead's real goal in this litigation is not to protect its interests but, rather, to make the process of investigating wrongdoing as difficult as possible for its stockholders.

### D.    Conditions on Inspection

This decision does not address whether it is appropriate to enter conditions on inspection. In its pretrial brief, Gilead asked that inspection be subject to four specific

---

[275] *See supra* note 85 and accompanying text.

conditions.[276]  In its post-trial brief, Gilead suggests that the parties should meet and confer regarding the conditions.[277]  Plaintiffs appear to agree that a meet and confer is warranted.[278]  The parties shall confer on whether conditions are appropriate and report to the court within twenty days of issuance of this decision.

### E.    Plaintiffs Are Granted Leave to Move for Their Fees and Expenses.

Delaware courts follow the American Rule that "each party is generally expected to pay its own attorneys' fees regardless of the outcome of the litigation."[279]  Even under the American Rule, however, this court retains the ability to shift fees for bad faith conduct "to deter abusive litigation and protect the integrity of the judicial process."[280]  In assessing "bad faith," this court can consider both litigation-related conduct and the party's pre-litigation conduct.[281]  Although there is "no single, comprehensive definition of 'bad faith'

---

[276] Dkt. 85, Def. Gilead Sciences, Inc.'s Pre-Trial Br. at 56–57 (requesting that inspection be subject to a mutually-agreeable form of confidentiality order, a Delaware forum selection provision applicable to any future litigated that uses the fruits of Plaintiffs' inspection, an incorporation condition like that entered in *Yahoo!*, and Gilead's ability to assert that certain documents are privileged or nonresponsive).

[277] Def.'s Answering Br. at 60.

[278] *See* Pls.' Opening Br. at 62–63.

[279] *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017) (citing *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005)).

[280] *Montgomery Cellular*, 880 A.2d at 227 (internal quotation marks omitted); *see also Martin v. Harbor Diversified, Inc.*, 2020 WL 568971, at *1 (Del. Ch. Feb. 5, 2020) ("Shifting fees for bad faith is not, properly speaking, an exception to the American Rule on fees; it is a method for reducing and appropriately allocating the costs of vexatious behavior sufficiently serious that justice requires such mitigation.").

[281] *Compare In re SS & C Tech., Inc. S'holders Litig.*, 948 A.2d 1140, 1149–52 (Del. Ch. 2008) (applying the bad faith exception to the American Rule and shifting fees because plaintiffs' counsel brought a motion to withdraw on notice in bad faith and made a series

that will justify a fee-shifting award,"[282] this court commonly employs the "glaring egregiousness" standard.[283] "The bad faith exception is applied in 'extraordinary circumstances,'"[284] and it "is not lightly invoked,"[285] but this court has shifted fees in Section 220 actions where a party's conduct rose to the level of bad faith.[286]

Delaware courts have urged stockholders to use the "tools at hand" and pursue Section 220 inspections before filing derivative lawsuits for decades,[287] and this court has seen a rise in Section 220 enforcement actions in recent years.[288] The regrettable reaction

---

of misstatements in filings "that tended to misrepresent or downplay the facts"), *with Hardy v. Hardy*, 2014 WL 3736331, at *17 (Del. Ch. July 29, 2014) (applying the bad faith exception to the American Rule to pre-litigation conduct and holding that the exception can apply "where the pre-litigation conduct of the losing party was so egregious as to justify an award of attorneys' fees" (quoting *Est. of E. Murton DuPont Carpenter v. Dinneen*, 2008 WL 2950764 (Del. Ch. Mar. 26, 2008))).

[282] *Montgomery Cellular*, 880 A.2d at 227.

[283] *See, e.g.*, *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 879 (Del. 2015) (affirming this court's determination under the "glaring egregiousness" standard to shift fees); *Isr. Disc. Bank of N.Y. v. First State Depository Co.*, 2013 WL 2326875, at *28–29 (Del. Ch. May 29, 2013) (applying the "glaring egregiousness" standard in assessing potential fee shifting); *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 47–48 (Del. Ch. 2010) (same); *In re Charles Wm. Smith Tr.*, 1999 WL 596274, at *2–4 (Del. Ch. July 23, 1999) (same).

[284] *E.g.*, *Shawe*, 157 A.3d at 150–51; *Montgomery Cellular*, 880 A.2d at 227; *accord. Dover Hist. Soc.*, 902 A.2d at 1092; *Henry v. Phixios Hldgs., Inc.*, 2017 WL 2928034, at *14 (Del. Ch. July 10, 2017) (Montgomery-Reeves, V.C.).

[285] *Ravenswood Inv. Co. v. Winmill & Co.*, 2014 WL 2445776, at *4 (Del. Ch. May 30, 2014) (quoting *Beck v. Atl. Coast PLC*, 868 A.2d 840, 851 (Del. Ch. 2005)).

[286] *See, e.g., Carlson v. Hallinan*, 925 A.2d 506, 545–46 (Del. Ch. 2006); *McGowan v. Empress Ent., Inc.*, 791 A.2d 1, 3–8 (Del. Ch. 2000); *Technicorp Int'l II, Inc. v. Johnston*, 2000 WL 713750, at *44 (Del. Ch. May 31, 2000).

[287] *See supra* note 169.

[288] *See* Edward B. Micheletti, et al., *Recent Trends in Books-and-Records Litigation*, 38

by defendant corporations has been massive resistance. As one academic article commented, "defendants have turned books and records litigation into a surrogate proceeding to litigate the possible merits of the suit where they place obstacles in the plaintiffs' way to obstruct them from employing it as a quick and easy pre-filing discovery tool."[289] These obstacles increase the investment required from stockholder plaintiffs and their counsel when pursuing Section 220 inspections.

It seems that defendants like Gilead think that there are no real downsides to overly aggressive defense campaigns at the Section 220 phase. Although aggressively defending a Section 220 action will result in higher defense costs during that phase, the approach can undermine follow-on derivative claims if successful, thereby lowering net costs for defendants. Even if the approach is unsuccessful in thwarting inspection, the work product created in building legal defenses to follow-on derivative claims can be repurposed in the context of the derivative suit. And the risk of reputational harm to defendants resulting from a decision detailing possible corporate wrongdoing rendered under the plaintiff-friendly Section 220 standard appears to lack the deterrent effect one might expect it to have.

---

Del. Law. 18, 18 (2020) ("[T]he frequency of stockholder demands to inspect corporate books and records has increased . . . ."); Cox et al., *supra* note 6 at 2123, 2146–47 (comparing the number of Section 220 actions filed from 1981 to 1994 with those filed from 2004 to 2018 and finding a thirteen-fold increase).

[289] Cox et al., *supra* note 6 at 2150.

Scholars have recommended fee shifting as one means of recalibrating the risks of Section 220 litigation.[290] This proposition finds support in prior decisions of this court and the Model Business Corporation Act.[291]

Fee shifting may be appropriate here. Gilead exemplified the trend of overly aggressive litigation strategies by blocking legitimate discovery, misrepresenting the record, and taking positions for no apparent purpose other than obstructing the exercise of Plaintiffs' statutory rights. Gilead's pre-litigation failure to provide any Plaintiff with even a single document despite the ample evidence of a credible basis and the obvious responsiveness of certain categories of documents amplifies the court's concerns.

For these reasons, Plaintiffs are granted leave to move for fee-shifting.

## III. CONCLUSION

For the foregoing reasons, judgment is entered in favor of Plaintiffs. The parties shall confer regarding conditions on inspection and concerning a form of order

---

[290] *See id.* at 2151 ("Delaware should give serious consideration to awarding plaintiffs their attorneys' fees in cases where the defendants make untoward efforts to delay the resolution of these summary cases."); Randall Thomas, *Improving Shareholder Monitoring of Corporate Management by Expanding Statutory Access to Information*, 38 Ariz. L. Rev. 331, 335 (1996) (arguing that for Section 220 to facilitate effective stockholder monitoring, it must be significantly streamlined, including shifting attorneys' fees to deter frivolous refusals to produce information).

[291] *See supra* note 286; Model Business Corporation Act § 16.04(c) ("If the court orders inspection and copying of the records demanded, it shall also order the corporation to pay the shareholder's costs (including reasonable counsel fees) incurred to obtain the order unless the corporation proves that it refused inspection in good faith because it had a reasonable basis for doubt about the right of the shareholder to inspect the records demanded.").

memorializing the scope of Gilead's production. Plaintiffs may seek leave to move for fee-shifting.